**Dr. Alan C. WESELEY, Plaintiff,**

v.

**SPEAR, LEEDS &
KELLOGG, Defendant.**

**No. 88 C 397.**

United States District Court,
E.D. New York.

April 20, 1989.

Richard Appleby, New York City, for plaintiff.

Reid & Priest (Charles F. Schirmeister, of counsel), New York City, for plaintiff class member, Gemeenschappelijk Administratiekantoor.

Fulbright Jaworski & Reavis McGrath (James E. Nespole, of counsel), New York City, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff brought this action under section 10(b) of the Securities Exchange Act (the Act), 15 U.S.C. § 78j(b) (1982), alleging that defendant artificially inflated the opening price of J.P. Morgan common stock on October 20, 1987. The parties entered into a settlement, which the court approved. Plaintiff's counsel, Richard Appleby, Esq. (Appleby), now moves for an award of $575,000 in attorney's fees and a special award of $5,000 for his client.

### I.

Defendant is a "specialist" for a number of stocks traded on the New York Stock Exchange (the Exchange). A specialist has an exclusive franchise to make markets in stocks assigned to it. It may act as a broker, holding or executing and receiving a commission on orders to buy or sell, or as a dealer, buying or selling for its own account to prevent wide price swings in its assigned stocks. The specialist frequently sets a stock's opening price.

Defendant was a specialist for the J.P. Morgan common stock (the Stock) on October 20, 1987. On the previous day, "Black Monday," the Stock fell from $41.62 per share to $27.75 at the close. The next morning defendant set an opening price of $47, a rise of 69% from the previous close. There had been no significant announcements about J.P. Morgan in the interim.

Plaintiff had placed a market order to purchase 2,000 shares of the Stock prior to the opening of trading on October 20th. On the opening transaction defendant executed plaintiff's market order and those of other purchasers totalling 500,000 shares.

The stock market was volatile that day, and trading was heavy. After two and a half hours the price of the Stock fell to $29; it closed at $34.25. Plaintiff alleges that defendant sold at $47 a substantial amount of the 500,000–share block from its own account, knowing the opening price to be artificially inflated.

Appleby investigated these events for two months before determining to file the complaint in March 1988. He began discovery shortly thereafter and retained a former specialist on the Exchange to educate him in the mechanics of specialist trading. He deposed four people: the Chairman of the Exchange, about the Exchange's investigation of defendant's trading in the Stock on October 19th and 20th; two floor officials of the Exchange, about their participation in the decision to open the Stock at $47 per share; and the individual specialist at defendant who set the

opening price of the Stock on October 20th. Defendant's counsel took plaintiff's deposition. Appleby successfully moved to compel production of a substantial number of documents from the Exchange and defendant.

On August 15, 1988, the court certified a shareholder class of all persons who purchased the Stock at $47 per share prior to the opening of trading on October 20, 1987 (the Class), excluding defendant and its subsidiaries and affiliates. The court named plaintiff class representative and Appleby counsel to the Class.

Thereafter serious settlement negotiations began. Appleby estimated the maximum damages sustained by the Class to be $6.5 million. Defendant ultimately agreed to pay $2.5 million for the benefit of the Class (the Fund), and deposited that sum, invested in short-term Treasury Bills, in a bank on November 15, 1988. The court preliminarily approved the terms of the settlement on January 13, 1989 and directed that notice of it be sent to the Class.

No member of the Class elected to opt out. After holding a hearing on March 17, 1989 the court approved the settlement as fair, reasonable, and adequate.

Appleby seeks $575,000 in attorney's fees, or 23% of the Fund, as well as $7,866.94 in disbursements, and asks for a special award of $5,000 for his client for acting as class representative.

A member of the Class, Gemeenschappelijk Administratiekantoor (GAK), objects. GAK placed a market order for 75,000 shares of the Stock prior to the opening of trading on October 20, 1987, sustaining a loss of approximately $856,250. Although GAK considered filing its own action against defendant, it chose to remain in the Class and participate in the settlement.

## II.

The court may award class counsel fair and just compensation out of the fund obtained for the class. *In re Agent Orange Prod. Liability Litig.*, 818 F.2d 226, 232 (2d Cir.1987) (citing *Trustees v. Greenough*, 105 U.S. 527, 536, 26 L.Ed. 1157 (1882)); *see Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980).

To determine a fair fee the court must first calculate the appropriate "lodestar" figure by multiplying the number of hours reasonably billed by the hourly rate normally charged for equivalent work by similarly-skilled attorneys in the region. *In re Agent Orange, supra*, 818 F.2d at 232 (citing *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir.1977) (*Grinnell II*)).

The court may then adjust the lodestar upward or downward to take into account such factors as the quality of counsel's work, the riskiness of the litigation, and the complexity of the issues. *Id.* (citing *Grinnell II, supra*, 560 F.2d at 1098).

## A. The Lodestar

■ Appleby claims a lodestar of $214,637.50, representing 744 hours of his time at $275 per hour, 35 hours of time by Vivian Shevitz, Esq., at $200 per hour, and 20.25 hours of Shevitz's associates at $150 per hour. He properly does not include time spent preparing his fee application.

The amount of time expended on the case is reasonable. For example, Appleby claims to have spent 73.25 hours preparing his motion for class certification, including briefing the motion and defending plaintiff's deposition. To spend less than 75 hours on a major and vigorously contested motion strikes the court as unusually efficient.

Appleby's most time-consuming task, requiring 259.75 hours, was, not surprisingly, to investigate the pertinent facts and conduct discovery. These hours include time required to prepare for and take four depositions, to accomplish all other discovery, and to investigate not only the events of October 20th but also the arcane world of the floor specialists on the Exchange.

The total number of hours appears reasonable, indeed probably far less than a large law firm with several associates assigned to the case would have spent. As a sole practitioner, Appleby could avoid much

duplication of effort, particularly in investigating the facts.

The hourly rates requested are in keeping with those normally charged by similarly-skilled attorneys in litigation of this kind in the New York metropolitan area. *See, e.g., Ross v. A.H. Robins Co.,* 700 F.Supp. 682, 686 (S.D.N.Y.1988) ($200–250 per hour reasonable for partners at prominent securities firm in case begun in 1977 and ended in 1985).

■ Such rates are, of course, somewhat artificial, because there is no market for the hourly services of a plaintiff's securities lawyer. Counsel virtually always prosecute cases like this one on a contingent-fee basis. An appropriate comparison, however, is with the fees customarily charged by attorneys for defendants in similar cases. If counsel for both sides produce comparable work, they ought to receive commensurate compensation. *See In re Agent Orange, supra,* 818 F.2d at 234.

In this case Appleby produced cogent and well-researched papers and was effective at oral argument. The range of fees he requests—$150 to $275 per hour—presumably compares favorably with those charged by his adversaries, and GAK does not claim otherwise.

The court finds that Appleby's hourly rates are reasonable and approves the lodestar of $214,637.50.

## B. The Multiplier

Appleby asks the court to apply a multiplier of slightly less than 2.7 to the lodestar to take account of the quality and efficiency of his work and the complexity and risk of the litigation. That multiplier would yield him fees of $575,000, or 23% of the Fund. (He says that he excludes from the multiplier 50 hours spent preparing for the settlement hearing and expected to be spent administering and distributing the Fund. By the court's calculations, however, with such an exclusion the fees would amount to $556,146.25.)

GAK objects to the 2.7 multiplier, claiming that it represents a windfall to Appleby at the expense of the Class. In GAK's view, the lodestar is adequate to compensate Appleby for his time, and he should get no more.

Taking into account the risk and complexity of the case and the quality of Appleby's work, the court concludes that Appleby is entitled to an upward adjustment, but not to quite so great a multiplier as he seeks.

### 1. *Adjustment for Risk*

■ The most significant factor in the calculation of an upward adjustment is the risk of the litigation. *See, e.g., id.* at 236 (citing *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 471 (2d Cir.1974) (*Grinnell I*)). In a case of this kind, counsel for the class receives a fee only if the outcome is successful. Yet it is in the public interest to encourage capable counsel to undertake meritorious litigation on behalf of defrauded securities holders. To that end courts reward success at a higher rate than counsel would receive if his fee were assured, as it is for defendant's and GAK's counsel. To award only the lodestar would be to give inadequate encouragement to bring meritorious but risky claims.

Moreover, where the claim presents novel legal issues or difficulties of proof making the outcome highly uncertain, the court should reward counsel's success at a higher rate than where the claim is more or less routine and success relatively assured.

On the other hand, to adjust the lodestar upward in a case that is risky not because of its novelty or complexity but because it lacks merit under established legal principles would encourage what some have called "corporate bounty-hunting." *See id.* at 235–36.

This case presented significant difficulties of proof. The court is aware of no civil case alleging section 10(b) violations by a specialist. Although section 10(b) prohibits "any person," including specialists, from manipulating stock prices as defendant is alleged to have done, *see* 15 U.S.C. § 78j(b), a specialist's function is to set prices to ensure a fair and orderly market in its assigned stocks.

It would have been hard to prove that defendant willfully manipulated the opening price of the Stock on October 20, 1987, rather than simply made an error of judgment. The burden of proving scienter would have been particularly heavy in view of the disruptions in the market on the previous day and the fact that defendant sustained substantial losses trading in the Stock on October 20th. A further obstacle would have been the Exchange's approval of the opening price.

The failure of any other plaintiff's counsel to join Appleby further shows the case's novelty and difficulties of proof. The Exchange and the Securities and Exchange Commission received several complaints about defendant's action in setting the opening price for the Stock, suggesting no dearth of potential plaintiffs. Securities cases are frequently prosecuted by as many as 15 or 20 different firms; even relatively small cases like this one usually involve more than one counsel. Appleby says he approached another major plaintiff's firm to join him, and that firm declined to do so because it felt the claim was too risky. The case merited an article in *The Wall Street Journal* on August 18, 1988, where it was characterized as "unusual," yet no other firm thought it worthy of a significant investment in time and resources.

Moreover, of the three persons who sought arbitration from the Exchange as to defendant's actions, one received a dismissal of the claim, one elected to participate in this case instead, and one won $5 per share.

Nonetheless, the court views plaintiff's claim as potentially meritorious and worthy of encouragement. The acts that defendant allegedly committed are the sort of market manipulation that the federal securities laws were designed to prevent. Although proof of scienter would have been difficult, there is objective evidence of it in the huge disparity between the closing price of the Stock on October 19th and the opening price on the next day and in defendant's trading much of the 500,000–share opening block for its own account.

One kind of risk not present here is the prospect of protracted litigation with no certainty of reward. This case concerned the actions of one firm on one morning. The complaint asserts only one claim. The Class is relatively small, and there is only one class representative. Both discovery and trial would have been far less time-consuming than in securities cases where there are multiple plaintiffs, defendants, and claims, and the fraud allegedly occurred over an extended period of time. Even if the case had proceeded to trial, it probably would not have dragged on for years. The risk to counsel in undertaking the litigation was correspondingly less than in a massive, less discrete case.

Accordingly, the court adjusts the lodestar for risk as follows: To a multiplier of 1 (representing the lodestar), the court will add a factor of 0.5 to account for the contingent nature of counsel's fee and a factor of 0.5 to account for the particular risk of this case, bringing the total multiplier thus far to 2.0.

## 2. Adjustment for Complexity

■ Appleby argues that his lodestar ought to be augmented further in recognition of the complexity of the litigation. He urges that the role of specialists on the floor of the Exchange is complicated, technical, and not widely known. He had to penetrate their insular world and master the mysterious details of their profession in order to educate himself as to the merits of the claim.

The court has no doubt that this is true. But in other respects this case was less complicated than many securities cases. The focus was on one issue, scienter, and on only a few actors over a few hours. To prove damages here would have been much simpler than in cases involving an on-going fraud where plaintiffs must reconstruct how the market should have operated over an extended period of time.

On balance, the case presented an average level of complexity for a securities case. Counsel's hourly rate adequately compensates him for the intellectual obstacles he faced.

### 3. *Adjustment for Quality*

■ Appleby next argues that his multiplier should be raised in recognition of the quality of his work. He claims that because of his skill and experience in the securities field he could prosecute the action unusually efficiently and achieve a satisfactory result.

The court has determined the reasonableness of Appleby's hourly rate in part by comparing it to that charged by his adversaries. It is therefore logical to adjust that rate for the quality of Appleby's performance by comparing it with the quality of defense counsel's work. If Appleby's work was notably less skilled or less efficient than his adversaries', then he ought to receive less compensation; if notably more so, then more. *See In re Agent Orange, supra*, 818 F.2d at 234 (quality of representation presumed to be reflected in lodestar; upward adjustment proper only where success "exceptional") (quoting *Blum v. Stenson*, 465 U.S. 886, 899, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984) (awarding fees under 42 U.S.C. § 1988)).

Defense counsel set a high standard of performance in this action, as a leading law firm ought. Appleby fully matched that standard. His court papers and oral arguments were consistently professional. His grasp on the merits of his case and the underlying legal principles is sound.

By prosecuting the action almost entirely himself, Appleby was able to achieve efficiencies. Only one person had to master the merits of the case, avoiding duplication of effort. Although he had to educate himself about the role of specialists on the Exchange, any litigator would have had to do the same. His experience in the field evidently helped him both to deal with the legal issues expeditiously and to negotiate a favorable settlement within three months of class certification. He appears to have scrupulously avoided undertaking unnecessary discovery or burdening the court with unnecessary motions.

The court will reward his admirably efficient handling of the case by adding 0.3 to his multiplier. *See In re King Resources Co. Sec. Litig.*, 420 F.Supp. 610, 631 (D.Colo.1976) ("'A surgeon who skillfully performs an appendectomy in seven minutes is entitled to no smaller fee than one who takes an hour; many a patient would think he is entitled to more.'") (quoting Hornstein, *Legal Therapeutics: The "Salvage Factor" in Counsel Fee Awards*, 69 Harv.L.Rev. 658, 660 (1956)).

The total multiplier is thus 2.3. Excluded from it are the 50 hours spent preparing for the settlement hearing and to be spent administering the fund, since this work involves little risk and less expertise than the earlier stages of the litigation. Appleby's total fees therefore come to $475,791.25.

### C. *Comparison With Other Awards*

■ In support of his request for a higher multiplier Appleby cites cases awarding a larger percentage of the total fund than 23% or a larger multiplier than 2.7.

It is true that courts often assess the reasonableness of counsel's fees by comparing them with the total recovery. *See, e.g., In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 749 (S.D.N.Y.1985) ("Traditionally, courts in this Circuit and elsewhere have awarded fees in the 20%–50% range in class actions."), *aff'd*, 798 F.2d 35 (2d Cir.1986). The Supreme Court apparently approved this practice in dicta in *Blum, supra*, 465 U.S. at 900 n. 16, 104 S.Ct. at 1550 n. 16. Nonetheless, unlike counsel in a negotiated contingent fee case, Appleby is not entitled to a fixed percentage of the Fund. Rather, comparison of the size of his fees with the total recovery serves merely as a benchmark to ensure that he is not obtaining too much of the recovery. If the fee appropriately takes into account the factors discussed above, the court should not augment it solely because it represents a below-average percentage of the settlement.

In this circuit, fees typically range from 15% to 30% of the recovery. *See, e.g., Ross, supra*, 700 F.Supp. at 688 (26.1% representing multiplier of 1.8); *Genden v. Merrill Lynch, Pierce, Fenner & Smith*, 700 F.Supp. 208, 209 (S.D.N.Y.1988) (15.7% "well within the customary range in cases

of this nature"); *Golden v. Schulman*, [1988–1989 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 94,060, at 90,953 (E.D.N.Y. Sept. 30, 1988) (30%); *In re Pepsico Sec. Litig.*, 82 Civ. 8403 (ADS) (S.D.N.Y. Apr. 26, 1985) (20%); *Weinberger v. Flow General, Inc.*, [1984 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 91,541, at 98,731 (S.D.N.Y. June 13, 1984) (25%); *In re New York City Mun. Sec. Litig.*, [1984 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91,419, at 98,085 (S.D.N.Y. Mar. 28, 1984) (almost 33% representing multiplier of 1.09); *Van Gemert v. Boeing Co.*, 516 F.Supp. 412, 418–22 (S.D. N.Y.1981) (22% representing multiplier of 1.7); *Amsterdam v. Turbodyne Corp.*, [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,976, at 91,031 (S.D.N.Y. Mar. 27, 1981) (29.4% representing multiplier of 1.15); *In re Franklin Nat'l Bank Sec. Litig.*, [1980 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 97,571, at 97,988 (E.D.N.Y. June 24, 1980) (34% representing multiplier of 1.01).

The 19% of the settlement that a 2.3 multiplier would yield is within the normal range for this circuit, albeit on the lower end of that range. Although courts have awarded a higher percentage of the settlement fund in other cases, often based on a much lower multiplier, this court considers a fee of $475,791.25 ample to compensate Appleby for undertaking this litigation and pursuing it effectively. *See Grinnell II*, *supra*, 560 F.2d at 1099 ("judges determining fee awards should not be unduly influenced by the monetary size of the class settlement or judgment"); *Grinnell I*, *supra*, 495 F.2d at 466, 471.

Nearly all the cases cited to support the claim that a multiplier of 2.7 is "average" are from other circuits. *See, e.g., In re Trilogy Sec. Litig.*, 84 Civ. 20617(A) (RPA) (N.D.Cal.1986) (multiplier of 4.37); *In re Oak Indus. Sec. Litig.*, Master File No. 83–0537–G(M) (S.D.Cal.1986) (multiplier of 4.0); *Kurgan v. Boise*, 84 Civ. 5677 (C.D. Cal.1986) (multiplier of 3.5); *In re General Pub. Utils. Sec. Litig.*, [1983–1984 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,566, at 97,233–34 (D.N.J. Nov. 16, 1983) (multiplier of 3.45 awarded in "awesome and complex" securities case); *Municipal Auth. of Bloomsburg v. Pennsylvania*, 527 F.Supp. 982, 999–1000 (M.D.Pa.1981) (multiplier of 4.5, characterized by court as "extremely high" and "probably without precedent," awarded in case brought under Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 *et seq.*, because of "peculiar facts of this case"); *In re Cenco, Inc., Sec. Litig.*, 519 F.Supp. 322, 326–28 (N.D.Ill. 1981) (multiplier of 4.0 awarded to lead counsel, whom court praised for "very lean" staffing; other firms awarded 2.0); *Keith v. Volpe*, 86 F.R.D. 565, 575–77 (C.D. Cal.1980) (multiplier of 3.5 awarded in environmental protection and civil rights action during period of high inflation); *Jorstad v. IDS Realty Trust*, 489 F.Supp. 1180, 1194 (D.Minn.1980) (multiplier of less than 3.5 representing 5% of settlement), *vacated*, 643 F.2d 1305 (8th Cir.1981) (both lodestar and multiplier excessive); *Miller v. Fisco, Inc.*, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,348 at 93,187 (E.D.Pa. Feb. 27, 1978) (multiplier of 2.8).

Some of the opinions cited by Appleby are not only from other jurisdictions but involve antitrust claims, which are notoriously complex, protracted, and bitterly fought. *See In re Corrugated Container Antitrust Litig.*, [1983–2] Trade Cases (CCH) ¶ 65,628, at 69,155 (S.D.Tex. Sept. 1, 1983) (multipliers of 2.5 to 4.0 constituting less than 10% of recovery awarded in complex antitrust case), *vacated*, [1985–1] Trade Cases (CCH) ¶ 66,457, at 65,292 (S.D. Tex. Dec. 16, 1983); *Brewer v. Southern Union Co.*, 607 F.Supp. 1511 (D.Colo.1984) (multipliers of 3.0 to 3.35); *J.N. Futia Co. v. Phelps Dodge Indus.*, [1982–2] Trade Cases (CCH) ¶ 64,978, at 73,065 (S.D.N.Y. Sept. 17, 1982) (multiplier of 3.0); *Pacific Plumbing Supply Co. v. Crane Co.*, [1982–1] Trade Cases (CCH) ¶ 64,473, at 72,648 (W.D.Wash. Jan. 8, 1982) (multiplier of 3.0 awarded in "novel" antitrust case after jury verdict); *In re Gypsum Cases*, 386 F.Supp. 959, 961, 967 (N.D.Cal.1974) (multiplier of 3.0 awarded in seven-year antitrust case "in which, probably more than in any other such litigation, the congressional objective of private antitrust enforcement was realized"), *aff'd*, 565 F.2d 1123 (9th

Cir.1977); *Arenson v. Board of Trade*, 372 F.Supp. 1349, 1358 (N.D.Ill.1974) (multiplier of 4.0 awarded in landmark antitrust case).

In this circuit courts are more conservative. Indeed, the court is aware of only one instance of a court in this circuit awarding so high a multiplier as 2.7 in a securities class action. *In re Pepsico Sec. Litig., supra* (multiplier of 3.3 representing 20% of settlement). A multiplier of 2.3 appears to be above average. *See, e.g., Ross, supra*, 700 F.Supp. at 687 (multiplier of 1.8 awarded in eleven-year-old securities class action involving "highly complex and novel issues of law"); *Genden, supra*, 700 F.Supp. at 209 (multiplier of 1.3); *Golden, supra*, at 90,954 (multiplier of 2.3); *Eltman v. Grandma Lee's, Inc.*, [1986–1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,798, at 93,901 (E.D.N.Y. May 28, 1986) (multiplier of 2.0 awarded in securities case presenting difficult jurisdictional issues); *Friedlander v. Barnes*, [1986–1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,754, at 93,676 (S.D.N.Y. May 8, 1986) (multiplier of less than 1.3); *In re Warner Communications, supra*, 618 F.Supp. at 749 (multiplier of 2.26 awarded to "cream of the plaintiff's bar" for achieving $18 million settlement); *Milstein v. Huck*, 600 F.Supp. 254, 257 (E.D.N.Y.1984) (multiplier of 1.5 awarded to "highly respected law firm in this field" in novel and complex securities case presenting difficulties for plaintiffs on the merits); *Weinberger, supra*, at 98,731 (multiplier of 2.0); *In re New York City Mun. Sec. Litig., supra*, at 98,085 (multiplier of 1.09 awarded in "unusual" securities case); *Van Gemert, supra*, 516 F.Supp. at 419–20 (multiplier of 1.7 awarded to "extraordinarily capable" counsel in 14–year–long securities case that "made new law"); *Amsterdam, supra*, at 91,031 (multiplier of 1.15); *In re Franklin Nat'l Bank Sec. Litig., supra*, at 97,988 (multiplier of 1.01).

The court, mindful of its responsibility to guard the interests of the Class from whose pockets the attorney's fees will come, *see, e.g., Grinnell II, supra*, 560 F.2d at 1098–99, 1101; *Grinnell I, supra*, 495 F.2d at 469 (quoting *Trustees, supra*, 105 U.S. at 546), concludes that a multiplier of 2.3 is appropriate to reward Appleby for his excellent efforts in bringing the case to a successful resolution.

### III.

■ Appleby asks the court to award plaintiff, an ophthalmologist, a special award of $5,000 to compensate him for the time and inconvenience of serving as class representative. GAK objects that such an award is unwarranted.

Plaintiff, who has never before been a plaintiff in a securities action, took time away from his practice to respond to defendant's document request and to be deposed. Beyond these normal obligations of class representation, however, he did not perform any extraordinary services to the class. This case is therefore unlike the *Genden* case, in which the court awarded the class representative, who was also an attorney, $20,085 for "consultative services" performed on behalf of the class during both the investigative and the litigation phases of action. *Genden, supra*, 700 F.Supp. at 210.

Although it is laudable that plaintiff undertook to prosecute this litigation, the court perceives no circumstances warranting a special award. A class representative is a fiduciary to the class. If class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard. *See Women's Committee for Equal Employment Opportunity v. National Broadcasting Co.*, 76 F.R.D. 173, 180 (S.D.N.Y.1977) ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised."). *But see Golden, supra*, at 90,-954 ($5,000 special award); *In re GNC Shareholder Litig.*, 668 F.Supp. 450, 451 (W.D.Pa.1987) ($3,000 "incentive award" made to each of three class representatives); *Troncelliti v. Minolta Corp.*, 666 F.Supp. 750, 752 (D.Md.1987) ($2,000 special award in antitrust action).

There is not the faintest suggestion, and Appleby's high standing and reputation before this court make it inconceivable, that any collusion occurred in this case. But the principle remains.

At his deposition, plaintiff testified that his motivations in bringing the action were to get his money back, to make defendants pay everyone else back, and to restore confidence in the specialist system. In the light of his reasons for commencing suit he will no doubt be well satisfied with the settlement and content to share in it equally with the Class.

### IV.

The court awards Appleby attorney's fees of $475,791.25 and disbursements of $7,866.94, and denies the request for a special award of $5,000 to the class representative.

So ordered.