724 F.Supp. 160 (1989)
In re UNION CARBIDE CORPORATION CONSUMER PRODUCTS BUSINESS SECURITIES LITIGATION.
This Document Relates to: All Actions.
No. MDL 692 (CLB).
United States District Court, S.D. New York.
October 24, 1989.
*161 Milberg Weiss Bershad Specthrie & Lerach, Goodkind Labaton & Rudoff, Wolf Haldenstein Adler Freeman & Herz, New York City, Kenneth H. Hanson, Chicago, Ill., Cahill Gordon & Reindel, Davis Polk & Wardwell, Skadden Arps Slate Meagher & Flom, Cravath Swaine & Moore, Schulte Roth & Zabel, New York City, Greenfield & Chimicles, Haverford, Pa., Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., Hennigan & Mercer, Elwood S. Kendrick, Los Angeles, Cal., Harvey Greenfield, New York City, for plaintiff.

MEMORANDUM DECISION

[Legal Fees]
BRIEANT, Chief Judge.
In a decision dated July 13, 1989, 718 F.Supp. 1099, this Court approved, pursuant to Fed.R.Civ.P. 23(e), a settlement in the amount of $31,730,917 (the Settlement Fund) between the class members and defendants Union Carbide Corporation (Union Carbide) and Morgan Stanley & Co. as set forth in the Stipulation of Settlement dated December 22, 1988. Familiarity of the reader with the prior proceedings in these consolidated cases must be assumed.
The terms of the Stipulation of Settlement provide that the legal fees of counsel who produced the settlements for plaintiffs shall be paid out of the Settlement Fund in an amount to be fixed by the Court. At the time that we issued the findings and conclusions approving the settlement of these actions, this Court believed that it would be improvident to make a determination concerning legal fees and disbursements, at least until the final judgment approving the settlement achieved appellate finality. Accordingly, the Court severed the issue of the attorneys' fees and deferred resolution of the fee request pending appellate finality of the judgment entered on July 25, 1989 on the July 13, 1989 findings and conclusions.
The Court also believed that, in the interest of fairness, plaintiffs' counsel should submit supplemental applications for reimbursement of additional expenses incurred before the Settlement Fund is distributed *162 to authorized claimants, in order to account for time expended by plaintiffs' attorneys from March 10, 1989, the cut-off date used by counsel initially in calculating their lodestar, at least through July 25, 1989, the date of this Court's order approving the settlement, or, if the case was appealed, through the date of the Court of Appeals' judgment.
No appeal was taken in the case. On September 8, 1989, plaintiffs' counsel submitted updated affidavits documenting the time expended by their law firms on this case through August 24, 1989. Accordingly, the issue of the award of attorneys' fees is now appropriate for determination.
Plaintiffs' attorneys, with the exception of Harvey Greenfield, now jointly request an award of attorneys' fees in the amount of $6,026,073 to be paid from the Settlement Fund, together with reimbursement of expenses in the amount of $460,956.40, which includes amounts expended for the retention of experts. Based on the 1988-89 non-contingent hourly rates of plaintiffs' law firms, the lodestar amount is $2,348,230 for the 11,208 hours plaintiffs' counsel expended on this litigation over the past three years.
The requested fee is 2.57 times the lodestar, representing a composite multiplier of 2.6 for the time expended by members of plaintiffs' steering committee, and 2 for the time expended by other counsel. With the exception of Harvey Greenfield, plaintiffs' counsel have agreed to allocate the aggregate fees awarded among themselves in relation to the amount of work and the responsibilities undertaken, the risks sustained, and the relative contributions of the various law firms towards the settlement. Mr. Greenfield has made his own separate application for fees and disbursements.
Mr. Greenfield initially made a separate fee application because of his objection to lead counsel having suggested he should reduce his requested lodestar amount from $163,350 to $50,000 before applying any multiplier. He also sought recompense for out-of-pocket expenses of $6,709.31. In a supplement to his application, Mr. Greenfield claimed an additional lodestar of $8,600.00 for 21.5 additional hours since August 1, 1989, and additional disbursements of $340.07, for a total disbursement claim of $7,049.38.
In a joint letter dated April 7, 1989 from Jerome M. Congress and Harvey Greenfield, the attorneys informed the Court that joint petitioning counsel would not challenge a lodestar figure for Mr. Greenfield of $90,000, and that Mr. Greenfield would accept that lodestar figure as a predicate for determining his fee award. With respect to the proposed multiple to be applied to Mr. Greenfield's lodestar, Mr. Greenfield believes that he should receive a multiple of 2.6 times his lodestar in light of the work he performed, his standing and expertise, and the background and experience of the plaintiff he represents, Charles Tanenbaum. The Court regards the talent of the client as having no significance in fixing the fees of the attorney, so long as he had standing to sue.
As required, counsel's joint fee application and Mr. Greenfield's separate application contain affidavits and billing records concerning the time charges over the three-year course of the litigation.
Counsel also request interest on the award of attorneys' fees, to run from the date of the award to the date of payment, at the same rate of interest as that being earned on the Settlement Fund. The cost of administering the settlement, including the costs of notice, will also be paid from the Settlement Fund in addition to the fees and expenses of class counsel.

Discussion
The Supreme Court has long recognized that, when a plaintiff-representative successfully establishes or protects a fund in which the other class members have a beneficial interest, the costs of litigation may be spread among the fund's beneficiaries. Trustees v. Greenough, 105 U.S. 527, 15 Otto 527, 26 L.Ed. 1157 (1882); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Alyeska Pipeline Service Co. v. The Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Under the "equitable fund" doctrine, attorneys for *163 the successful party may petition for a portion of the fund as compensation for their efforts. As the Supreme Court stated in Boeing Co. v. Van Gemert, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980):
"[A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."
Id. at 478, 100 S.Ct. at 749.
In City of Detroit v. Grinnell Corporation (Grinnell I), 495 F.2d 448, 469 (2d Cir.1974), and again in Grinnell II, 560 F.2d 1093 (2nd Cir.1977), our Court of Appeals attempted to strike at a perceived problem of excessive fees in class actions. The Court twice reversed a fee award which it found, "reflects the district court's de facto reliance on the contingent fee approach" and "was excessive and displayed too much reliance upon the contingent fee syndrome." Grinnell I at 469. Seeking to avoid what it perceived as criticism of windfall fees on the part of the public in class actions, the court directed the fee fixing exercise towards the so-called "lodestar." It held in Grinnell II, page 1099 of 560 F.2d, that:
"Henceforth, Grinnell I made clear, the touchstone for the fee was to be the actual effort made by the attorney to benefit the class. In making its decision, the district court was to act `as a fiduciary who must serve as a guardian of the rights of absent class members.' Grunin v. International House of Pancakes, 513 F.2d 114, 123 (8th Cir.1975), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Throughout Grinnell I, the thrust was that the `award must be made with an eye to moderation. ...'" 495 F.2d at 470.
"In several respects, the fee award here fails to conform to these principles."
* * * * * *
"The court's failure to accompany this increase [above the lodestar] with any elucidation of its purpose or its justification directly contravenes the explicit mandate of Grinnell I that the district court specify fully the facts warranting any modification of its lodestar determination."
Our Court of Appeals also held in Grinnell I that in determining an award of attorneys' fees, the District Court should consider the following factors:
(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation (i.e., the contingent nature of the fee); (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.
Id. at 470.
Accordingly, the starting point for this Court's determination of a just and adequate fee to be paid to class plaintiffs' counsel in this case is the number of hours expended in prosecution of the litigation, or the lodestar. Our review of the record and our familiarity with this entire case shows that the hours expended by all counsel, as adjusted with respect to Mr. Greenfield, were reasonable, and reasonably necessary for the litigation. The time spent by jointly petitioning counsel was reasonably and efficiently allocated among senior partners, partners, associates and paralegals of each firm to provide high quality work at a lower cost, and was directly related to the prosecution of the class claims in this action. As to Mr. Greenfield, the Court finds that a lodestar of $93,200.00 is appropriate. This accepts the agreed figure of $90,000, with one day in court at $3,200 incurred thereafter. His additional work after the original fee submission, other than the appearance in court, seems essentially duplicative and unnecessary.
In arriving at their lodestar, class plaintiffs' counsel used current hourly rates as of year-end 1988 and 1989, rather than historic billing rates. Courts in this District have approved the use of current billing rates in calculating the lodestar amount, in order to "compensate for the delay in receiving compensation, inflationary losses, and the loss of interest." In re Generics Corp. of America Securities Litigation, [1980 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 97,719, 98,770 (S.D.N.Y.1980). *164 The holding of the Court of Appeals in New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136 (2d Cir.1983), further supports the propriety of using current (1988-89) hourly rates here. As the Second Circuit noted, "[i]f the services were rendered over two or three years, relevant figures for the current year will normally still be appropriate." Id. at 1152-53.
In light of the use of current rates, and the award of a multiplier, it seems inappropriate to add pre-judgment interest. Interest will be allowed from the date of the judgment to be entered hereon, to the date of payment at the net rate of return earned by the Settlement Fund.
Included in the requested lodestar are the hourly charges for paralegals' time. In United States Football League v. National Football League, 887 F.2d 408, 416 (2d Cir.1989), an antitrust case, our Court of Appeals, quoting Missouri v. Jenkins, ___ U.S. ___, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), held that "`the prevailing practice in a given community' is to govern whether paralegals' time is billed separately, and whether it is billed at cost or at market rates."
The Court of Appeals in United States Football League drew an inference "that the practice of New York law firms is to bill paralegal time at hourly or market rates," and concluded that "the hourly market rate for paralegal service in New York City is includable in the attorney's fees award in this case. We agree that billing for a paralegals' time in this manner `makes economic sense' and encourages cost effective delivery of legal services." Id.
This Court believes that the inference drawn by the Court of Appeals in United States Football League as to the New York custom and practice of billing the time of paralegals is well-founded, and we are confident that any law firms which are not billing their paralegal services at an hourly rate, will do so forthwith upon reading that decision. The practice does make economic sense, if for no other reason than to do otherwise creates a disincentive to use paralegals. We conclude therefore, in light of United States Football League that the inclusion of the paralegals' time within the lodestar is proper, and that the paralegals' time is entitled to such multiplier as the Court may award for the lawyers.
This litigation involved multiple claims against multiple defendants for violations of the federal securities laws and the common law in connection with Union Carbide's issuance of the Rights and the manner in which it calculated the payments Rightsholders were entitled to receive from the sale of Union Carbide's Consumer Products Division. Considering the multitude of issues and the substantial defenses asserted by each of the defendants, class plaintiffs were at risk that they would be unable to obtain any meaningful recovery at trial.
Class counsel's efforts throughout this litigation were performed on a wholly contingent basis, with counsel also advancing the many thousands of dollars of necessary disbursements. If, after trial, class plaintiffs were unsuccessful, due to the contingent nature of the lawsuit, class plaintiffs' counsel would have received no compensation. This contingent fee risk is the single most important factor in awarding a multiplier; perhaps it is the only remaining valid basis now recognized by the caselaw of multipliers. In In re Agent Orange Product Liability Litigation, 818 F.2d 226, 236 (2d Cir.1987), the Court of Appeals held:
"We have labelled the risk-of-success factor as `perhaps the foremost' factor to be considered under the second prong of the lodestar analysis. Grinnell I, 495 F.2d at 471. The multiplier takes into account the realities of legal practice by rewarding counsel for those successful cases in which the probability of success was slight and yet the time invested in the case was substantial."
The concept of awarding multipliers based also on the quality of the work and exceptional skills in the litigation and settlement negotiations, is described in Agent Orange as having been "severely restricted." *165 818 F.2d at 234. This restriction is said to have been imposed by Blum v. Stenson, 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984), a case which considered the effect of a statute which called for a reasonable attorneys fee "adequate to attract competent counsel, but ... [that does] not produce windfalls to attorneys." It is not entirely clear to this Court that Blum v. Stenson has been or should be lifted bodily into the caselaw concerning compensation of attorneys from a common fund. However, the later decision in Pennsylvania v. Delaware Valley Citizens' Council, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), awarding a fee authorized by a statute using the word "reasonable" in a case involving a non-monetary recovery, held at page 565, 106 S.Ct. at 3098:
"Expanding on our earlier finding in Hensley [v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)] that many of the Johnson [v. Georgia Highway Express, Inc., 488 F.2d 714, 717-719 (5th Cir.1974)] factors `are subsumed within the initial calculation' of the lodestar, we specifically held in Blum that the `novelty [and] complexity of the issues,' `the special skill and experience of counsel,' the `quality of representation' and `results obtained' from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the fee award. 465 U.S. at 898-900 [104 S.Ct. at 1548-49]. Although upward adjustments of the lodestar are still permissible, id. at 901 [104 S.Ct. at 1550], such modifications are proper only in certain `rare' and `exceptional' cases, supported by both `specific evidence' on the record and detailed findings by the lower courts. See id. at 898-901 [104 S.Ct. at 1548-49]."
Without intending in any way to criticize the reasoning employed by our Supreme Court, we note that implicit in the entire American tradition of the contingent fee lawyer, is the concept that the advocate would have a stake in the outcome, which interest would induce the lawyer to invest, or gamble, his or her time and often considerable disbursements [in actual practice seldom paid by losing contingent fee clients], hoping to share in the benefits which the client would enjoy as a result of the attorney's professional skill, quality of work and success in outcome. Fees based solely on lodestars, with multiples awarded solely with reference to risk, will destroy this traditional motivation that has served the clients, the profession and society so well and for so long.
However, it may well be that the entire matter of fixing legal fees is about to come full circle. Experience since Grinnell I has finally taught us that convoluted judicial efforts to evaluate the lodestar, and see to it that the lodestar hours were reasonable and necessary, and that the case was not overmanned or the time overbooked, are extremely difficult to say the least, and unrewarding. Such efforts produce much judicial papershuffling, in many cases with no real assurance that an accurate or fair result has been achieved. Often, where there is a suspicion, not present in this case, that lodestar hours were squandered in the litigation, the Court is left simply with making an arbitrary overall percentage cut in the lodestar. United States Football League, supra, at 411; Agent Orange, 818 F.2d at 238.
In colonial New York, the fees of barristers, then separate from solicitors, were determined by court rule, while in Philadelphia lawyers charged fees fixed by the market. It was well known that the free market produced better lawyers; for this and other reasons, Mrs. John Peter Zenger sent to Philadelphia for attorney Andrew Hamilton to defend her husband's liberty. She was not alone in doing this, and the expression "Philadelphia lawyer" entered our language to denote enthusiastic, high quality representation. Prior to 1848, contingent legal fee agreements were unlawful in New York.
In Gair v. Peck, 6 N.Y.2d 97, 188 N.Y. S.2d 491, 160 N.E.2d 43 (1959), the New York Court of Appeals considered a court rule adopted by an Appellate Division of the Supreme Court, which provided, with exceptions not material to our discussion, *166 that contingent fees in personal injury or death cases in excess of one-third of the net recovery were unreasonable and unconscionable, unless authorized by a written order of the court. In upholding the rule, the New York Court of Appeals noted that:
"[I]n recent years contingent fee agreements have been filed with the Clerk of the First Department at an annual rate of 150,000 or more, of which upwards of 60% have fixed the attorneys' compensation at 50% of the amount of the recovery. Ninety-five percent of the actions brought have been settled, and not more than one and one-half percent of all claims of this nature have gone to judgment after trial." Id. at 101-102, 188 N.Y.S.2d 491, 160 N.E.2d 43.
Far-seeing indeed, is the dissenting opinion of Judge Adrian Burke, page 118 of 6 N.Y.2d, 188 N.Y.S.2d 491, 160 N.E.2d 43, who said:
"Rule 4 here fails to take into account, at the very beginning, that the case may be tried and retried, that appeals may be taken, before a judgment may be collected. And in some instances, after all these services have been rendered, there is no money judgment for the plaintiff. These are the hazards which an attorney assumes when he accepts a client on a contingent fee basis. How can a court be so omniscient to state that, at the outset, before the greater part of the work has been done, that a particular percentage is unreasonable under any and all circumstances? Under some circumstances, it is quite conceivable that a contingent retainer fee of 33 1/3 of the recovery may be unreasonable. It may very well be that fees in excess thereof should be the exception rather than the rule. But the reasonableness of the fee  regardless of the percentage chosen  can only be determined in an ad hoc proceeding, after the event."
* * * * * *
Judge Burke continued at page 122, 188 N.Y.S.2d 491, 160 N.E.2d 43:
"Why, for instance, is a contingent fee of 33 1/3 % of the recovery fair and conscionable under all the circumstances, but a contingent fee of 34% unfair and unconscionable under all the circumstances? The reasonableness of the fee is not determined solely on the amount charged, but also by the quality of the services rendered in light of the circumstances of the particular case." [Citations omitted].
The perceived problem of unconscionability in contingent fees relates in part to economy of scale. Obviously, it is not ten times as difficult to prepare, and try or settle a ten million dollar case as it is to try a one million dollar case, although the percentage contingent fee will return ten times as much. This fact, and a perception of possible abuse, drove the Courts to the use of the lodestar followed by a multiple. Experience has shown that this is not an ideal way to fix fees, although it may be required by current caselaw. We are fortunate, indeed, in this case that the lodestar appears to be both reasonable and accurate. However, needless duplication of hours, and a temptation to re-invent the wheel at the expense of the client or common fund are often found in major litigation. In the final analysis after adjusting the lodestar to conform to reality where necessary, and after a reasonable multiplier has been developed, and all is said and done, a Court essentially makes no more than a qualitative assessment of a fair legal fee under all the circumstances of the case, just as if it had applied the twelve amorphous criteria set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-719 (5th Cir.1974), or the six equally amorphous criteria of Grinnell I, cited earlier.
On September 27, 1989 a panel in the Ninth Circuit in the case of Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268 (9th Cir.1989), considered the compensation due counsel under the common fund doctrine. Reversing a lodestar award representing 7% of the common fund that was created through the efforts of the appellant attorneys while acting concurrently for private parties under a one-third contingent fee, the Court of Appeals held:
"This reward represents a paltry seven percent of the common fund that was *167 created ... through the efforts of [counsel]. We consider this figure to be too low and therefore an unreasonable reward.
We leave to the district court the task of determining what would be reasonable compensation for creating this common fund, but we add the following advice. A task force commissioned by the Third Circuit has recommended that compensation for creating common funds be calculated by a percentage of the funds created. See Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 254-59 (1985); see also Blum v. Stenson, 465 U.S. 886, 900 n. 16 [104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891] (1984) (noting that the percentage basis method is grounded in tradition and therefore an acceptable way of calculating the fee award). This method stands in contrast to other courts who apply the `lodestar method,' which calculates the fee award by multiplying the number of hours reasonably spent by a reasonable hourly rate and then enhancing that figure, if necessary, to account for the risks associated with the representation. [Citations omitted]. We believe that either method may, depending upon the circumstances, have its place in determining what would be reasonable compensation for creating a common fund." [Citations omitted].
* * * * * *
"The sole remaining issue is what percentage of the common fund would provide [counsel] reasonable compensation. The answer to that question, of course, depends on the individual circumstances of this case with which the district court is more familiar than we are. Ordinarily, however, such fee awards range from 20 percent to 30 percent of the fund created. We note with approval that one court has concluded that the `bench mark' percentage for the fee award should be 25 percent. See Mashburn v. National Healthcare, Inc., 684 F.Supp. 679, 692 (M.D.Ala.1988). That percentage amount can then be adjusted upward or downward to account for any unusual circumstances involved in this case."
Thereafter, In re Activision Securities Litigation, 723 F.Supp. 1373 (N.D.Cal. 1989), the Court followed Paul, Johnson, supra, and held, (at 1375):
"Courts have pursued a number of alternatives at the fee application stage. Some, by themselves or with the assistance of a magistrate, have waded through the computer printouts, which often represent years of work by several firms, their partners, associates, and paralegals. Others have appointed special masters familiar with the field and with attorney billing to perform the details of the task and to make a recommendation. The special master is then paid from the common fund. This court has used both of these alternatives. Undoubtedly, there are more creative ones that other courts have found. What is curious is that whatever method is used and no matter what billing records are submitted to the [lodestar] regimen, the result is an award that almost always hovers around 30% of the fund created by the settlement.
The question this court is compelled to ask is, `Is this process necessary?' Under a cost-benefit analysis, the answer would be a resounding `No!' Not only do [lodestar] analyses consume an undue amount of court time with little resulting advantage to anyone, but, in fact, it may be to the detriment of the class members. They are forced to wait until the court has done a thorough, conscientious analysis of the attorneys' fee petition. Or, class members may suffer a further diminution of their fund when a special master is retained and paid from the fund. Most important, however, is the effect the process has on the litigation and the timing of settlement. Where attorneys must depend on a lodestar approach there is little incentive to arrive at an early settlement.
* * * * * *
Adoption of a policy of awarding approximately 30% of the fund as attorneys' *168 fees in the ordinary case is well-justified in light of the lengthy line of cases which find such an award appropriate and reasonable before or after superimposing the Lindy [Bros. v. Am. Radiator & Standard Sanitary Corp., 487 F.2d 161 (3rd Cir.1973)] or Kerr [v. Screen Extras Guild, Inc., 526 F.2d 67 (9th Cir.1975)] factors. Several years of this practice and the body of case law across the circuits validate this approach. The Supreme Court has accepted it. In Blum v. Stenson, 465 U.S. 886, 900 n. 16 [104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891] (1984), the Court noted approvingly the use of a percentage of the common fund to set attorneys' fees in common fund cases. In fact, the language of the note appears to assume that the percentage approach is routine. Distinguishing attorneys' fee determinations under fee shifting statutes such as 42 U.S.C. § 1988, the Court observed:
Unlike the calculation of attorney's fees under the `common fund doctrine,' where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation.
Id.
The Third Circuit, home of the Lindy formulation, recently criticized its application in common fund cases and recommended a return to a percentage of the fund approach. In the Report of the Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. 237 (1985), the Task Force concluded that the Lindy method was a `cumbersome, enervating, and often surrealistic process of preparing and evaluating fee petitions that now plagues the Bench and Bar....' Id. at 258. According to the Task Force, the percentage scheme with appropriate judicial supervision would ordinarily be adequate to protect the integrity of the fee award process."
* * * * * *
[T]he court is compelled to conclude that the accepted practice of applying the lodestar.... regime to common fund cases does not achieve the stated purposes of proportionality, predictability and protection of the class. It encourages abuses such as unjustified work and protracting the litigation. It adds to the work load of already overworked district courts. In short, it does not encourage efficiency, but rather, it adds inefficiency to the process.
Therefore, this court concludes that in class action common fund cases the better practice is to set a percentage fee and that, absent extraordinary circumstances that suggest reasons to lower or increase the percentage, the rate should be set at 30%. This will encourage plaintiffs' attorneys to move for early settlement, provide predictability for the attorneys and the class members, and reduce the time consumed by counsel and court in dealing with voluminous fee petitions."
Contingent fee arrangements implicitly recognize the risk factor in litigation and that the winning cases must help pay for the losing ones if a lawyer who represents impecunious plaintiffs, or those plaintiffs not so fully committed as to put their own money where their mouth is, will remain solvent and available to serve the public interest.
As discussed in the affidavit of Jerome M. Congress, Esq. and the Plaintiffs' Memorandum in Support of the Settlement, the recovery here was achieved only after virtually full preparation for trial and intensive bargaining. Counsel for the class are experienced and competent attorneys who prosecuted the merits of the class claims effectively. This Court conducted frequent case management hearings and meetings of counsel in connection with this multi-district litigation and had the opportunity to observe the ability and the performance of counsel. They proved to be experienced, professional attorneys.
Plaintiffs' counsel contend, and I agree, that they have striven to be as efficient as possible in their litigation of this action. As set forth in the affidavit of Jerome M. Congress, Esq., plaintiffs' counsel obtained extensive discovery without undue motion *169 practice, and negotiated a substantial settlement fund as soon as extensive document and deposition discovery provided a sufficient basis to evaluate the strengths and weaknesses of the case.
The Notice of Pendency of Class Action and Proposed Settlement sent out to class members informed them that class plaintiffs' counsel would, at the hearing, seek an award of attorneys' fees of up to 22.5% of the Settlement Fund of $31,730,917, and reimbursement of out-of-pocket expenses not to exceed $500,000 over and above the costs of notice and administration of the settlement. The requests before the Court are within this amount.
The award of attorneys' fees in complex securities class action litigation is informed by the public policy that individuals damaged by violations of the federal securities laws should have reasonable access to counsel with the ability and experience necessary to analyze and litigate complex cases. Enforcement of the federal securities laws should be encouraged in order to carry out the statutory purpose of protecting investors and assuring compliance. See Bateman Eichler v. Berner, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). A large segment of the public might be denied a remedy for violations of the securities laws if contingent fees awarded by the courts did not fairly compensate counsel for the services provided and the risks undertaken. These policies further support the award of a multiplier of counsel's lodestar fee. Our disposition should be consistent with the multiples awarded in other large complex cases alleging violations of the securities laws. See e.g., In re Warner Communications Securities Litigation, 618 F.Supp. 735, 749-50 (S.D.N.Y. 1985), aff'd., 798 F.2d 35 (2d Cir.1986), (multiple of 2.26 times lodestar), and Weseley v. Spear, Leeds & Kellogg, 711 F.Supp. 713, 720 (E.D.N.Y.1989) (multiple of 2.3 times lodestar).
The Court has received two objections to the fee request.
Intervenor Grant S. Lewis P.C. Pension Trust states in its Supplemental Memorandum that plaintiffs' counsel should be granted only their lodestar amount, and that no multiplier at all should be awarded. The Grant S. Lewis P.C. Pension Trust objected initially to the settlement of this action on the ground that the Rightsholders were clearly entitled to the $27 million withheld by Union Carbide for the dividend equivalent holders' claims, and therefore no benefit had been conferred on the class. We discuss the implications of this point below, in light of events occurring and knowledge acquired after the settlement of this lawsuit was approved.
In addition, in a letter dated March 6, 1989, Union Carbide stockholder M. Mikkor objects to the award of $7.63 million in legal fees to plaintiffs' counsel, calling the fees "outrageously excessive" since "the stockholders [sic] are getting a minuscule amount," and because as a current stockholder, which many but not all class members are, complainant is "also paying for the legal costs of Union Carbide brought on by this suit." M. Mikkor proposes legal fees of 1-5% of the Settlement Fund. It is not known to this Court whether or not M. Mikkor is a member of the plaintiff class with standing to object. Since this objection is no more than a naked statement of the objectant's opinion, it is entitled to little weight.
This Court concludes that the contingency risk normally considered by the Courts in awarding a multiplier, warrant some multiplier here. However, the Court does not find the plaintiffs' risk so great (or the success so exceptional) as to justify fee multipliers in the amount requested. Counsel should be compensated over and above their normal hourly rates where they have taken significant litigation risks and thereby produced a substantial benefit in an action to enforce rights "worthy of judicial encouragement," which this is. See In re "Agent Orange" Product Liability Litigation, 818 F.2d 226, 28 (2d Cir.1987).
In approving the settlement of this action for $31,730,917, this Court considered the uncertainty of the outcome of the Nicholson case, then pending in the New York State Supreme Court, and what we believed at the time would be an inevitable delay in *170 its resolution. While the ink was scarcely dry on our interlocutory judgment, however, the Nicholson litigation between Union Carbide and the company's dividend equivalent holders was settled for $15 million paid by Union Carbide, together with a rewriting of the instruments under which dividend equivalent holders receive their dividend equivalents, so as to guard against future disputes. If our case had not settled prior to Nicholson, the plaintiff Rightsholders class here would have then received the difference between the sum of $27,000,000 withheld for the Nicholson claimants, less the $15,000,000 finally paid to them, and reasonable transactional costs, which this Court estimates at $500,000 or less.
Since defendants' counsel asserted at our settlement hearing that any reversionary interest of our class in the $27 million withheld from the Rightsholders to await the outcome of Nicholson was factored into the sum offered and accepted in settlement of this litigation, the net result is now that the Rightsholders' many other claims for securities fraud, etc. were, at least from an economic point of view, settled for $20,239,917, and not $31,739,917 as would appear. This is so because once Nicholson was settled, our plaintiff class would have been entitled to the unexpended portion of the $27,000,000 which was withheld ($11,500,000), and this even in the absence of this lawsuit.
Based on the foregoing analysis and applying the courts informed judgment to the award of legal fees, the Court hereby awards the plaintiffs steering committee counsel a lodestar amount of $2,187,688.75 which in the Court's discretion will be augmented by a multiplier of 2.3, leading to a total fee of $5,031,684.
Petitioning counsel other than the steering committee are hereby allowed a lodestar in the amount of $169,041, which in the Court's discretion will be augmented by a multiplier of 1.5 to be applied to the lodestar, leading to a total fee award of $253,561. The application of Mr. Greenfield will be disposed of in the same fashion by awarding a lodestar as noted above of $93,200, enhanced by a multiplier of 1.5, making a total award to Mr. Greenfield of $139,800.
The Court notes that these fees amount to approximately 27% of the true economic recovery which is in keeping with the custom and practice in awarding fees in common fund cases in this District, said to range typically from 15% to 30% of the recovery. See Weseley v. Spear, Leeds & Kellogg, 711 F.Supp. 713, 718 (E.D.N.Y. 1989); see also In re Warner Communications Securities Litigation, 618 F.Supp. 735, 749-50 (S.D.N.Y.1985); see also Paul, Johnson, supra, finding a 20% to 30% range in the Ninth Circuit. Such an award is consistent with the new learning (old wine in a new bottle) announced by the Ninth Circuit in Paul, Johnson, supra, which new learning we believe will proceed from West to East and take us back to straight contingent fee awards bereft of largely judgmental and time-wasting computations of lodestars and multipliers. These latter computations, no matter how conscientious, often seem to take on the character of so much Mumbo Jumbo. They do not guarantee a more fair result or a more expeditious disposition of litigation.
The disbursements as requested all appear proper and they are hereby allowed.
The foregoing constitutes findings and conclusions of the Court on the matter of the legal fees and disbursements. Settle a final judgment on notice, which shall stay payment pending appellate finality.
So Ordered.