Bari-Ellen ROBERTS, Sil Chambers, Janet Leigh Williams, Marsha Harris, Beatrice Hester and Veronica Shinault, Plaintiffs,

v.

TEXACO, INC., Defendant.

No. 94 CIV.2015(CLB).

United States District Court, S.D. New York.

Sept. 11, 1997.

Daniel Berger, Bernstein, Litowitz, Berger, Grossman, New York, N.Y., Michael D. Hausfeld and Cyrus Mehri, Cohen, Milstein, Hausfeld & Toll, Washington, D.C., for plaintiffs.

Milton J. Schubin, Andrea Christenson, Kaye, Scholar, Fierman, Hays & Handler, New York, N.Y., Joseph Moan, Texaco, Inc. Legal Dept., White Plains, N.Y., for defendants.

### MEMORANDUM & ORDER

BRIEANT, District Judge.

By objection fully submitted on August 4, 1997, Plaintiff Veronica Shinault ("Shinault"), a member of the Plaintiff class in this action based on discrimination in employment based on race, objects to that part of the Special Master's Report, dated July 22, 1997, which recommends that she be awarded an Individual Incentive Award in the amount of $2,500, in addition to her share of the Settlement Recovery of the Plaintiff Class.

Familiarity of the reader with all prior proceedings in this case is assumed, including familiarity with the Report submitted under date of July 22, 1997 by Charles G. Moerdler, Esq., Special Master appointed by this Court pursuant to an Order issued April 1, 1997. The Special Master's Report is incorporated in this decision by reference and attached and made a part hereof. This Court now adopts the Report as its own findings and conclusions in the matter. By an Order issued July 29, 1997 the court authorized the payment of the legal fees and incentive awards as recommended in the Report.

The Special Master was appointed to hear and report upon the application of Plaintiffs' counsel for legal fees rendered in the prosecution of the action to the entry of the Judgment filed March 21, 1997, and for legal services to be rendered in behalf of the class during the administration of the Task Force on Equality and Fairness in Employment created under the Judgment.

The scope of the reference to the Special Master also included the obligation to hear and report upon, "the individual Plaintiffs' application for Incentive Awards."

The Special Master recommended, and the Court authorized, Incentive Awards for the initial Plaintiffs Bari–Ellen Roberts and Sil Chambers as well as four additional Plaintiffs added to the case in the First Amended Complaint, Plaintiffs Janet Leigh Williams, Marsha Harris, Beatrice Hester and Veronica Shinault.

After a full discussion of the authorities in this and other jurisdictions pertaining to incentive awards, the Special Master reported that each of the Plaintiff–Applicants expended time and effort in assisting in the prosecution of the litigation, or in bringing to bear added value, for example by imparting knowledge of and utilizing their ability to analyze and explain Texaco's employment practices. The Special Master noted that there were special circumstances evident in the case, including the possibility of retaliation for initiating or conducting the litigation. Fear of retaliation in this context is not limited to a fear of possible direct action by the employer, but rather ranges from hostili-

ty to threats to job assignment changes which may be initiated against the Plaintiffs by others in the lower echelons of the company, whose loyalty is offended by the disruption caused by the litigation, and who may not be aware of the duty of an employer to refrain from retaliation.

The Special Master analyzed the extent of the participation of each applicant for an incentive award. For reasons fully expressed in the Report, the Special Master recommended an award of $85,000.00 to Ms. Roberts and $50,000.00 to Mr. Chambers. As to the Plaintiffs Williams, Harris and Hester who joined the litigation after it had commenced, the Special Master analyzed their participation and contribution and concluded that each should receive an Incentive Award of $25,000.00.

█ In considering the application of Objectant Veronica Shinault, the Special Master noted that she had provided valuable assistance to counsel in prosecuting the litigation, however, he also reported that, "one critical element ... separates Ms. Shinault from the other Plaintiffs. She resigned from Texaco shortly before the commencement of this action by Plaintiffs Roberts and Chambers. Hence, her submission lacks any significant post-litigation burden or risk." For those reasons the Special Master recommended an Incentive Award to Ms. Shinault of $2,500.00 rather than the $100,000.00 sum requested.

In her objections Ms. Shinault argues that she should receive the same amount recommended for Plaintiffs Williams, Harris and Hester. Ms. Shinault argues that "she too faced a substantial risk as a result of her decision to come forward and serve as a named Plaintiff" because of the possibility that post-employment retaliation could exist in the giving of employment references and the treatment of other items which may arise after an employee has left the company. In this regard she relies on Robinson v. Shell Oil Company, ── U.S. ──, 117 S.Ct. 843, 848, 136 L.Ed.2d 808 (1997) recognizing the threat of post-employment retaliation by giving a poor reference and holding such conduct actionable if retaliatory.

The nature of post-employment retaliation is somewhat different from retaliation experienced on the job by persons filing complaints of discrimination. Co-workers, lower level supervisors, forepersons and the like can and often do engage in retaliation on the job against a co-worker or subordinate who is perceived to be "not a team player," or disrupts the harmony of the organization. Employers try to cultivate loyalty and a team effort. Few employees in a major organization last very long unless they become imbued with a team spirit reflecting a desire to have the organization succeed. On the other hand, post-employment retaliation can only be effected by personnel managers and the like serving at a much higher level in the company, who are well aware of their legal obligations not to retaliate and who are undoubtedly familiar with the Robinson case.

In a large organization such as Texaco the likelihood of illegal retaliation after employment has ceased should be regarded in this day and age as effectively nil. On the other hand, the litigant who remains on the job can expect, as noted earlier, that lower level co-workers and supervisors may perceive his or her actions as disloyalty and evidence of an attitude contrary to the common good. This is a valid distinction perceived by the Special Master. This Court agrees that the distinction between a Plaintiff who joined a lawsuit after leaving the company and after the lawsuit had started, and a Plaintiff who remained throughout the many months during which this hard fought litigation was in the pretrial stage is a valid distinction, which may properly be reflected in a far lower incentive reward.

To the extent that Ms. Shinault now claims that she possessed information of which the other Plaintiffs were not aware, this argument could have been presented to the Special Master at the time of the initial hearing, but was not. The Special Master held an extensive hearing and prepared a complete Report of the results of his hearing. Applicants had a full opportunity to be heard individually and through their counsel if they so desired.

This Court in reviewing objections to the Report of a Special Master does not substitute its own judgment and discretion for that

of the Special Master. The only issue is that set forth in Rule 53(e)(2) F.R.Civ.P.: Is the finding clearly erroneous? This Court concludes that it is not. Our Court of Appeals has held that a district judge "must accept the Master's findings of fact unless they are clearly erroneous." *Collins v. Foreman*, 729 F.2d 108, 118 (2d Cir.1984).

This Court concludes that the resolution of the amount of the individual incentive payment to be awarded to Ms. Shinault was valid in light of all of the surrounding circumstances, and declines to change it. The Objection to the Report is disapproved and dismissed, and to the extent not previously adopted by the Order of this Court filed July 29, 1997 the entire Special Master's Report annexed hereto is now adopted as the decision and order of this Court.

SO ORDERED.

### SPECIAL MASTER'S REPORT

CHARLES G. MOERDLER, Special Master.

This report is submitted pursuant to the April 1, 1997 order of United States District Judge Charles L. Brieant appointing the undersigned as Special Master, pursuant to FRCP Rule 53, to hear and report upon

(1) the application of plaintiffs' counsel for legal fees for services

(a) rendered in the prosecution of the action to the entry of the Judgment, filed March 21, 1997, and

(b) to be rendered on behalf of plaintiffs during the Administration of the Task Force created under the Judgment; and

(2) the individual plaintiffs' application for incentive awards.

### BACKGROUND

This action was commenced on March 23, 1994. The putative plaintiff Class then was represented solely by plaintiffs Roberts and Chambers. The complaint alleged that Texaco had engaged in a pattern and practice of discrimination against the individual plaintiffs and the Class in violation of Section 1981 of the Civil Rights Act of 1971, as amended in 1991 (42 U.S.C. § 1981) ("Section 1981"), and Section 296 of the New York Human Rights Law (N.Y. Exec. Law § 296).

On June 30, 1994, a first Amended Complaint was filed, adding claims on behalf of plaintiffs Williams, Harris, Hester and Shinault, and asserting that, as to all plaintiffs and the putative Class, Texaco had violated Title VII of the Civil Rights Act of 1964, as amended in 1991 (42 U.S.C. §§ 2000e, *et seq.*), ("Title VII").

Concisely put, the Amended Complaint charged that, beginning no later than March 23, 1991, Texaco had, by certain employment policies and practices, engaged in conduct that had a disparate impact upon and abridged the rights of salaried African–American employees of Texaco in promotions, compensation, and the terms and conditions of their employment, including training and job assignments.

Texaco answered on July 15, 1994, denying all claims of wrongdoing and liability.

Mediation, under the auspices of the Community Relations Service of the United States Department of Justice, commenced in or about October 1994. Some twenty-five separate mediation sessions were held, but it was concluded that the parties' positions were too far apart, and litigation resumed in or about February 1995.

Plaintiffs moved for Class certification on May 15, 1995. Texaco opposed, and discovery ensued. In August 1996, plaintiffs moved to add Title VII claims to the Class motion. A right-to-sue letter, containing class allegations, was received from the United States Equal Employment Opportunity Commission ("EEOC"). Relying thereon, plaintiffs' counsel sought to expand the class beyond the scope of the right-to-sue letter. Texaco opposed, noting that it was seeking reconsideration before the EEOC. On September 27, 1996, Judge Brieant heard counsel and, pursuant to agreement of the parties, then scheduled a hearing for December 6, 1996 on the Class certification motions.

In the period preceding the scheduled December 6 hearing, several significant events occurred, culminating in the execution of an Agreement in Principle, dated November 15,

1996, between counsel for the parties, to settle the action. The major event involved the so-called "Lundwall tapes."

Richard A. Lundwall was a fairly senior staffer in Texaco's headquarters' Finance Department, located in Harrison, New York. It appears that in August 1996, Lundwall approached plaintiff Roberts, who worked in the same Texaco Department, and offered her information that he claimed could materially aid plaintiffs in this litigation.[1] Ms. Roberts referred Mr. Lundwall to one of her counsel, rather than pursuing the subject directly with him. Mr. Lundwall thereupon contacted Cyrus Mehri, an associate at Cohen, Milstein, Hausfeld & Toll, one of plaintiffs' counsel. Mr. Lundwall reportedly then told Mr. Mehri that, at age 55 and after a lifelong career with Texaco entities, his employment had been terminated. He felt betrayed and asked if Mr. Mehri could represent him in a suit against Texaco. Mr. Mehri declined, on conflict grounds. Mr. Lundwall thereupon repeated the assertion, previously made to plaintiff Roberts, that he had important information that would aid plaintiffs' cause in this litigation, disclosing that he had surreptitiously made micro cassette recording tapes of certain Texaco business meetings. Later, copies of those tapes were made available to Mr. Mehri, and were then enhanced and transcribed at the instance of plaintiffs' counsel.

At the April 30, 1997 conference before the Special Master, a copy of that transcript of plaintiffs' version of the Lundwall tapes was marked as an Exhibit. It has been reviewed and contains statements that evidence racial bias by senior officials of Texaco.[2] Additionally, the transcript reflects statements that can fairly be interpreted as evidencing an attempt to impede discovery by, among other things, concealing, withholding or destroying information that might be germane to pending discovery requests in this litigation.

On October 29, 1996, Judge Brieant, at the request of plaintiffs' counsel, signed an order directing Texaco to show cause why sanctions should not issue predicated upon the Lundwall tapes' disclosures respecting the impeding of discovery. The proceedings and excerpts from plaintiffs' version of the transcript of the Lundwall tapes were soon thereafter disclosed to the press and received wide publication.[3]

On November 15, 1996, counsel for the parties entered into the Agreement in Principle to settle the litigation. Several days later, Texaco's Chairman and Chief Executive Officer, Peter Bijur, in an address to the Westchester County Association, acknowledged:

> Once the taped conversations were revealed, there was no question in my mind

---

1. See, e.g., Frankel, *Tale of the Tapes*, The American Lawyer 65 (March 1997); Eichenwald, *Texaco Executives, On Tape, Discussed an Impending Bias Suit*, The New York Times, November 4, 1996; Eichenwald, *Investigation Finds no Evidence of Slur on Texaco Tapes*, The New York Times, November 11, 1996

2. It merits emphasis that, soon after release of information concerning the Lundwall tapes, Texaco retained distinguished counsel, Michael Armstrong, to investigate. As part of that process the Lundwall tapes were, apparently, re-mastered. The more offensive racial bias, reported in the transcript of plaintiffs' version of the tapes, does not, according to press reports, appear in the transcript of that portion of the re-mastered tapes, which interpret in different terms the words and sounds appearing on the enhanced version of the re-mastered tapes. See, Eichenwald, *Investigation Finds no Evidence of Slur on Texaco Tapes*, The New York Times, November 11, 1996. See also, Eichenwald, *Report says 3 Executives Misled Texaco*, The New York Times, July 15, 1997. However, neither a copy of the

transcript of the above-mentioned re-mastered tapes, or of any portion thereof, was submitted or examined in these proceedings. The following circumstances account for that omission.

As later more fully appears, as part of the Court-approved settlement, Texaco created a Settlement Fund by depositing $115 million in cash with a designated escrow agent upon the understanding that such deposit would fully discharge Texaco's economic obligations. Texaco also then agreed that it would not oppose the applications for attorneys' fees and incentive awards, which the Court would resolve. Texaco thus had no standing to object to either of the applications at issue here. It accordingly did not receive notice of or participate in these proceedings, or make any submission herein (i.e., the Armstrong tapes or transcript).

Finally, it merits note that for the reasons set forth above, Texaco is not bound by the factual findings or historical recitations herein set forth.

3. See fn. 2.

that settlement was the right step to take. It was the reasonable and honorable course of action. It takes the issue we face from the realm of confrontation in the courts into the arena of active cooperation and joint action. It allows the healing process to proceed.[4]

On March 18, 1997, following notice, Judge Brieant conducted a hearing as to (a) the fairness of the proposed settlement of this action, in accordance with the Agreement which had been reduced to writing under date of January 23, 1997, and (b) the applications, at issue here, seeking attorneys' fees and incentive compensation for the individual plaintiffs. The only opposition, relating solely to the applications for attorneys' fees and incentive compensation, came by way of several, essentially form, letters that were submitted to the Court.[5]

By order dated March 21, 1997, Judge Brieant concluded that the settlement had been arrived at by arms' length negotiations between equally informed parties, that it is fair and reasonable, is highly beneficial to the Class and should be approved. Judgment thereon was entered that day.

The approved settlement, as relevant here, provided as follows:

(a) On November 22, 1996, Texaco created a Settlement Fund by depositing $115 million in cash with a designated escrow agent. The Settlement Fund, together with earned interest, would pay (i) monetary claims arising out of the settlement; (ii) costs, including reasonable attorneys' fees for plaintiffs counsel, the expenses of plaintiffs experts, and consultants, (iii) the cost of administration of the Plan of Allocation as among the litigant Class, (iii) any other obligations that Texaco might have in connection with payments or distributions from the Settlement Fund, and (iv) any other purpose the Court might order. The $115 million thus deposited would fully discharge Texaco's economic obligations under the settlement, including awards to the plaintiff class, administrative costs attendant to the settlement and its effectuation, and attorneys' fees [6];

(b) Texaco would increase the salaries of all members of the Class who were employed by Texaco or its subsidiaries on November 15, 1996 (the date of the Agreement in Principle) by an amount equal to 11.34% of each such person's

4. Transcript of November 19, 1996 Statement of Peter Bijur before the Westchester County Association, Exhibit E to Class Counsel's Submission To The Special Master In Further Support Of Application For An Award Of Attorneys' Fees. Parenthetically, it merits note that on the next day, the EEOC moved before Judge Brieant to intervene in this action. On January 3, 1997, Texaco and the EEOC filed a stipulation with the Court resolving all of the claims raised in the EEOC's letter of determination of June 6, 1996, and imposing various stated requirements, including one requiring Texaco not to engage in any discriminatory employment practices, and providing for compensation and other relief in accordance with the settlement agreement between plaintiffs herein and Texaco. Judge Brieant "So Ordered" that stipulation following a hearing.

5. The objectants were James Larry Pitre, Floyd Thompson, Cassandra L. Roberts, Sandra J. Amerson, Sunny O. Anyalebechi, Willie R. Treadwell, Nell Rose Clark, Willie Alfreda Hill, Billy R. Amerson, Patricia A. Robers, Belinda Louise Jackson, and Teretta B. Johnson. The writers claimed to be members of the settlement class and objected to the fees sought by class counsel

on the basis of an attached "op-ed" article published in the Wall Street Journal. Smith and Lindemann, *Legal Billing: Is the Meter Broken*, The Wall Street Journal, January 27, 1997. The article contains interesting musings on an important public policy issue. However, it adds nothing to an analysis that must rest on the applicable law.

6. The dollar "value of the settlement" has been variously described. It includes not just the initial $115 million escrow deposit, but the cost of the Task Force and other aspects of cost and benefit. Plaintiffs' expert, Dr. Charles R. Mann, in an affidavit, sworn to March 11, 1997, estimated the total value of the settlement to be $35 million for the cost of initiating and maintaining the activities of the Task Force, $22 million in wage increases over the five-year settlement period, $23 million in compensation for pay inequity during the class period, $64 million in compensatory damages and $28 million in incentive awards, expenses and fees for a total of $172 million. On this application, plaintiffs counsel cite to that $172 million as the economic value of their contribution. For reasons stated in the text, it is not necessary for the Special Master to accept or reject that figure.

base annual salary, such increase to be in addition to, and not instead of or as replacement for, any other salary increase that such person would receive in 1997 in the ordinary course of business;

(c) Texaco affirmed its commitment to provide, to the fullest extent possible, an environment of inclusion and the eradication of prejudice within the company. An entity, later reconstituted by the Court, with the assent of the parties, as the Task Force on Equality and Fairness (the "Task Force") would be created and charged during its five-year term with initiating and determining the effectiveness of improvements and additions to Texaco's human resources programs and helping to monitor the progress made in such programs toward creating opportunity for African–Americans, diversity in the Texaco workforce and equal opportunity for all Texaco employees. The Task Force would be composed of three designees by each of Texaco and plaintiffs, with one independent person to be agreed to by the parties to serve as Chair. The Task Force would provide to the Court, Texaco's Chairman and its Board of Directors a report every six months for a term of five years setting forth information relevant to the impact of the settlement, plus a detailed annual report to the Court, and Texaco's Chairman and Board of Directors concerning the impact of its actions. Texaco agreed to fund the reasonable compensation of the Task Force, and the reasonable cost of its staff, consultants, statisticians and other appropriate experts.

(d) Determinations of the Task Force would apply to all salaried non-officer job positions at all grade levels, in all departments, divisions and subsidiaries nationwide. In the event Texaco objected to any final determination of the Task Force with respect to the actions

it was authorized to recommend or implement under the Agreement, such objection would be made to the Court. Should such objection eventuate, counsel for plaintiffs would participate in the proceedings before the Court in support of the Task Force determination thus challenged. Importantly, in terms of this application, "[a]ll reasonable fees and expenses of Plaintiffs' counsel, including reasonable expert fees and expenses, in so doing will be paid by Texaco." [7]

(e) Texaco will have no obligation to pay "any money" other than as explicated in the Settlement Agreement, including plaintiffs' attorneys fees, or the costs of plaintiffs or the Class. Such reasonable attorneys' fees, costs and expenses as plaintiffs or their counsel may establish and the Court may approve, shall be payable out of the Settlement Fund created by Texaco's initial $115 million deposit and the accrued interest thereon.[8] Plaintiffs' application for counsel fees and expenses would be submitted to the Court for approval, following Court approval of the Settlement. Texaco agreed that it would not oppose that application. Plaintiffs' costs, attorneys' fees, and related awards approved by the Court shall be paid from the Settlement Fund.

By order entered April 1, 1997, the undersigned was appointed Special Master to hear and report upon the pending applications of plaintiffs' counsel for attorneys' fees, and the application of plaintiffs for incentive awards.[9]

Notice of an April 30, 1997 Conference of all counsel and affected parties before the Special Master was sent by U.S. mail to all interested parties under date of April 6, 1997. Among those to whom notice was sent were those members of the Settlement Class who had previously objected in writing to the awards (see fn. 5, *supra*). None of the objectants chose to appear or submit any

---

7. Stipulation and Settlement Agreement, executed January 21, 1997, at ¶ 23.

8. *Id.* at ¶ 33.

9. The Special Master's oath then was executed and submitted for filing.

additional matter.[10] Under the Stipulation and Settlement Agreement, as approved, Texaco, having deposited the $115 million in escrow, no longer had any further role, nor any responsibility for additional payment obligations with respect to the attorneys' fees and incentive awards issues. It was, therefore, without standing before the Special Master and, accordingly, was not given notice of these proceedings and did not participate therein.

Prior to the Conference, plaintiffs' counsel made documentary submissions in support of their application and that of the applicant-plaintiffs.

The Conference was transcribed, and the transcript will be submitted to the Court herewith, together with the exhibits then marked.

Responding to questions posed by the Special Master at the Conference and thereafter, counsel for plaintiffs made several additional submissions, which to the extent relevant will, likewise, be submitted to the Court.

## I.

### COUNSEL FEES

Three law firms act as co-counsel for plaintiffs: Bernstein, Litowitz, Berger & Grossmann LLP ( "Bernstein, Litowitz"); Cohen, Milstein, Hausfeld & Toll PLLC ("Cohen, Milstein"); and Semmes, Bowen & Semmes ("Semmes Bowen"). They jointly apply [11] for an award of counsel fees aggregating twenty-five percent of the $115 million cash settlement, or $28,750,000.[12]

While plaintiffs' counsel focus primarily upon the $115 million cash settlement as the predicate common fund against which the counsel fee award should be measured, their application repeatedly emphasizes counsel's estimate that the full value of the Class recovery exceeds $172 million over the five-

---

**10.** One objectant, Sunny O. Anyalbecchi, subsequently inquired as to the status of these proceedings.

**11.** On the eve of the April 30, 1997 Conference, Semmes Bowen faxed to the Special Master a detailed submission, which Semmes Bowen unilaterally characterized as being "under seal." The application stated that Semmes Bowen had been unable to finalize an agreement with other counsel concerning its share of the fee award. Semmes Bowen added that, while discussions were continuing, absent agreement, it would press for a separate award. The amount and bases of that request were detailed. At the Conference, Semmes Bowen represented that all counsel had reached agreement *inter sese* and that its separate fee application was mooted. This report and recommendation does not contemplate a separate award for Semmes Bowen. Accordingly, since the Semmes Bowen application was mooted, comment upon the terms and sufficiency of the showing made in that submission is not required.

**12.** Counsels' detailed disbursements, as modified, aggregate $778,137.34 through the conclusion of settlement. They have been separately reviewed and approved by the Court for payment.

It merits note that plaintiffs' counsel in the Notice of Pendency of Class Action, Proposed Settlement and Fairness Hearing, dated January 24, 1997 (the "Notice"), called attention to its position that, in addition to the out-of-pocket costs and disbursement incurred in the litigation, recourse to the Settlement Fund would be sought for the costs attendant to providing notice and for other administrative expenses "as approved by the Court." At the April 30 Settlement Conference, counsel listed the included expenses as being "the expenses, for example, of paying the checks, of cutting checks, of calculating the awards, of tax counsel, for example, and any other administration that is necessary to pay the people the money that they're entitled to get out of the settlement." (Tr. 73). Counsel advised the Special Master, by letter dated July 15, 1997, that they intend in due course to apply to the Court for their remaining expenses from the Fund, specifically those in the following categories: (1) Professional fees and expenses of Special Tax Counsel (McCarter & English); (2) the professional fees and expenses of the settlement administrator (David Berdon & Co.) incurred in connection with printing and mailing the Notice, locating and identifying class members, and cutting and disbursing checks; and, (3) the professional fees and expenses of Dr. Charles Mann, counsels' statistical expert, for work in connection with applying the Plan of Allocation, correcting the information on the particular factors applicable to the individual class members as provided in the Plan of Allocation, and calculating the exact distribution amounts for each class member. Plaintiffs' counsel estimate, in their July 15, 1997 letter, that such additional expenses "will not exceed $200,000." Such matters are not currently before the Special Master. Hence, this Report does not comment upon the appropriateness or amount of the foregoing, other than to note that it will require separate application to and review and approval by the Court.

year period of monitoring (including the costs attendant to the creation and maintenance of the Task Force and the value of the Salary Increase package). However, in paragraph 35 of the Notice of Settlement it is represented that "Class Counsel will not seek an award of attorneys' fees for any other portion of the Settlement [than the $115 million cash settlement], including the Salary Increase that Class Counsel estimates to be worth $26 million, and the creation of the Task Force that Class Counsel estimates to be worth $36 million." While those added values cannot be gainsaid, the foregoing voluntary limitation is controlling.

Counsel have submitted combined detailed time records documenting their claim to having incurred hourly time charges, stated on the basis of current hourly rates, aggregating $3,460,417.50 [13] Additionally, they maintain that, following approval of the settlement, significant services remain to be performed in order to effectuate the settlement. Such services are approximated by plaintiffs' counsel to be (in terms of hourly charges) some 20% of the services rendered prior to approval. Counsel maintain that the combination of these services, together with the significant results achieved for the benefit of the Class, entitle them to an award of $28,750,000. With respect to the prospective services (i.e., those rendered or to be rendered following judicial approval of the settlement), counsel state that over the next five years (and with the assistance, in some instances, of experts retained by them) they will be required to perform various additional legal services. They include, among other matters, the selection and constitution of the Task Force,

obtaining tax rulings, computing allocations, communicating with Class members with respect to the criteria to be used in calculating their individual distributions, and resolving their inquiries, with Texaco's Human Resources Department, reviewing and evaluating the Task Force annual reports and the information that the Task Force shall submit to the Court, Texaco's Chairman and others concerning the impact of the settlement, and commenting upon and attempting to resolve such disputes as may arise as between the Task Force and Texaco with respect to the former's recommendations and proposals. The latter point focuses upon an aspect of the Stipulation and Settlement Agreement that merits clarification.

Under Paragraph 23 of the Stipulation and Settlement Agreement, *Texaco* undertakes the obligation to pay "[a]ll reasonable fees and expenses of Plaintiffs' counsel, including reasonable expert fees and expenses," in participating in proceedings before the Court in support of Task Force recommendations objected to by Texaco. Under ¶ 33 Texaco is absolved of any "obligation under this Settlement Agreement to pay any money *except only as expressly set forth in this Settlement Agreement.*" Unlike other payment obligations fixed by the Agreement (see ¶ 32), Texaco is not explicitly absolved of liability with respect to this aspect of post-proceeding attorneys' fees. Since plaintiffs' counsel maintain that they anticipate spending "some significant amount of time attempting to resolve any disagreements" arising out of conflicts presented concerning Task Force recommendations, plaintiffs' counsel was asked

---

**13.** The actual time records and supporting documents submitted to the Special Master showed a lodestar total of $3,460,417.50, plus $33,337.50 for an individual practitioner by the name of Diane R. Williams. At the Conference (Tr. p. 84–85) Ms. Williams was described as having defended various depositions. If those charges are included in the lodestar, as plaintiffs' counsel urge, they would bring the lodestar to $3,493,-755, a sum in excess of that reported to the Court. Thus, at page 42 of the affidavits submitted to Judge Brieant by Daniel Berger of the Bernstein Litowitz firm and Michael Hausfeld of the Cohen Milstein firm, the claim was made that the hourly-based time charges were valued at $3,482,571.75. For purposes of this determination, the lodestar will be deemed to be the number represented to the Court, namely $3,482,-571.75, which is supported by the documentation submitted to the Special Master.

Counsels' time charge documentation was, on submission to the Special Master, asked to be treated as confidential. The submission reflects a summary of the actual services rendered and includes some obviously privileged matter. The submission has been reviewed, and it appears to reflect reasonable and appropriate services that could fairly be stated to have the indicated value.

For completeness, it should be noted that the Semmes Bowen time charges were separately valued in accordance with District of Columbia practice and on an actual hourly rate basis (see fn. 14).

by the Special Master (following the conclusion of the conference and post-conference briefing) to clarify their position with respect to the payment obligation for such services. By letter dated May 28, 1997, Daniel L. Berger, on behalf of plaintiffs' counsel, acknowledged that:

> Going forward, Texaco has no obligation or responsibility for plaintiffs' attorneys' fees, with one exception. As provided in paragraph 23 of the Settlement Stipulation, if Texaco files an objection with the Court to a Task Force determination, plaintiffs' counsel are required to represent the Task Force before the Court, and Texaco is obligated to pay all reasonable fees and expenses of plaintiffs' counsel for such representation. Any such fees and expenses that Texaco would pay will be in addition to, and not come out of, the $115,000,000 cash settlement fund.

Thus, in fixing what prospective service obligations and fees, if any, may properly be attributed to the post-settlement services of counsel, no consideration should be given to prospective services that implicate participation on behalf of the Task Force in proceedings before the Court pertaining to its recommendations. If plaintiffs' counsel are entitled to compensation therefor, they must look to Texaco.

 The issue, then, is whether the fee request of $28,750,000 is appropriate in view of established time charges of slightly less than $3.5 million and an *estimate* that additional services will be required having a time charge value of some $700,000 (i.e., an additional service obligation of some 20% of the

services rendered to the date of conclusion of the settlement) [14].

Over the years, the Courts have taken varying approaches to the fixation of counsel fees in Class actions in which a common fund has been created from which such fees will be recovered. The formulas utilized in determining the award range from percentage of recovery, to "lodestar," to a combination of the two, sometimes modified by (a) a sliding scale geared to reduction of the percentage as the aggregate fund mounts and (b) a "bonus" if the proceeding is promptly resolved. *See,* Lapointe, *Attorney's Fees in Common Fund Actions,* 59 Fordham L.Rev. 843, 874 (1991); Berger, *Court Awarded Attorneys' Fees: What is "Reasonable",* 126 Univ. of Pa. L. Rev 281, 291 (1977).

The shift in this Circuit from the percentage of recovery approach to "lodestar" was marked by *City of Detroit v. Grinnell Corporation ("Grinnell I"),* 495 F.2d 448, 469 (2d Cir.1974); *see also City of Detroit v. Grinnell Corporation ("Grinnell II"),* 560 F.2d 1093 (2d Cir.1977). As Judge Brieant observed in *Union Carbide Corporation Consumer Products Business Securities Litigation,* 724 F.Supp. 160 (S.D.N.Y.1989), the Second Circuit, seeking to avoid perceived public criticism of windfall fees in class actions, reversed a fee award in *Grinnell I,* finding that it "was excessive and displayed too much reliance upon the contingent fee syndrome." *Id.* at 162. Pointing favorably to the "lodestar" formula, the Circuit in *Grinnell II* ruled that "the district court [must] specify fully the facts warranting any modification of its lodestar determination." *Grinnell II,* 560 F.2d at 1100. The factors the District Court

---

14. By letter, dated July 15, 1997, plaintiffs' counsel revised their estimate of the prospective services that they would be required to perform. Such revision was predicated on the time spent during the 19-week period from March 4, 1997 to July 14, 1997, which counsel stated amounted to 1942.25 hours of attorney and paralegal time, valued by them at $405,165.25. The bulk of that time was stated to have been spent in responding to inquiries from class members concerning the factors to be used in calculating their distributions, working with defense counsel and the Court in selecting the nominees and Chair for the Task Force and other start up issues, as well as working with tax counsel on taxation issues. Through a mathematical exercise that the Spe-

cial Master finds tortured, to say the least, Counsel argue that the initial 20% estimate would have produced a value of some $900,000 (as contrasted with the approximately $700,000 figure set forth above) and, using that figure as the predicate, the revised estimate is stated to be $1,750,000. The Special Master has confirmed that extensive services have been performed by plaintiffs' counsel subsequent to approval of the settlement and, quite likely, they have involved a greater expenditure of time and effort than had been anticipated, particularly in connection with unanticipated problems encountered in constituting the Task Force and the designation of an acceptable Chair. However, the estimate, which is just that and no more, seems excessive.

was directed to consider were aptly summarized by Judge Brieant as:

(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation (i.e., the contingent nature of the fee); (4) the quality of the representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Union Carbide*, 724 F.Supp. at 162.

"Lodestar" has continued to be a prevailing method of fee calculation in this Circuit [e.g., *Luciano v. The Olsten Corporation* 109 F.3d 111 (2d Cir.1997) [15]; *In re "Agent Orange,"* 818 F.2d 226 (2d Cir.1987); *New York State Association for Retarded Children, Inc., v. Carey,* 711 F.2d 1136 (2d Cir. 1983)], although some courts in this District have returned to the percentage of recovery method [*see generally Dubin v. E.F. Hutton Group Inc.,* 878 F.Supp. 616, 621 (S.D.N.Y.1995) (Leval, D.J.)]. Others have sought to engraft upon the percentage of recovery method a lodestar verification [*In re RJR Nabisco, Inc. Securities Litigation,* 1992 U.S. Dist. LEXIS 12702, Fed. Sec. L. Rep. (CCH) p96,984, 1992 WL 210138 (S.D.N.Y. Aug. 24, 1992)(Mukasey, D.J.)] while, conversely, lodestar has been utilized and reference then made to the percentage of recovery method, essentially to provide an additional check on the fairness of the award [*e.g., In re Dime Savings Bank,* 1994 WL 60884 (E.D.N.Y. Feb. 23, 1994, Fed. Sec.L.Rep.(CCH) p. 4) (Mishler, D.J.); *Kronfeld v. Transworld Airlines, Inc.,* 129 F.R.D. 598 (S.D.N.Y.1990) (Wood, D.J.) [16]]. In still another variation, a "billing judgment approach" has been utilized, one that focuses on the amount of time that should be devoted to the case in light of anticipated recovery [*See, Quaratino v. Tiffany & Co.,* 948 F.Supp. 332 (S.D.N.Y.1996) (Martin, D.J.)]. And while adjustments for "risk," complexity and quality of the legal work performed have been recognized [*see Weseley v. Spear, Leeds & Kellogg,* 711 F.Supp. 713, 717–18 (E.D.N.Y.1989) (Nickerson, D.J.)], such adjustments have also been criticized on the theory that a strong presumption exists that "the lodestar figure represents the 'reasonable' fee." [*Hurley v. Coombe,* 1996 WL 46889, *8 (S.D.N.Y. Feb.6, 1996) (Carter, D.J.) (*quoting City of Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449 (1992))].[17]

With some frequency, the courts employing the percentage of recovery method have lowered the percentage where the common fund is large, thereby to avoid a perceived windfall. *See e.g., International Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255 (8th Cir.1980); *Dunn v. H.K. Porter Company, Inc.,* 602 F.2d 1105 (3d Cir. 1979); *see also, Berchin v. General Dynamics Corp.,* 1996 WL 465752 (S.D.N.Y. Aug.14, 1996) (Martin, D.J.); *In re First Fidelity Bancorporation Sec. Litig.,* 750 F.Supp. 160 (D.N.J.1990); *Milstein v. Werner,* 58 F.R.D. 544, 551–52 (S.D.N.Y.1973) (Pollack, D.J.) ("As the amount of a recovery involved increases, equity and good conscience requires that fees based on percentages of the total recovery should decrease"); *Third Circuit Task Force Report, supra,* at 256.

Finally, plaintiffs' counsel claim that, over and above consideration of the benefit manifested by the common fund of $115 million, the fee award should include compensation for services necessarily to be rendered following consummation of the settlement. As previously noted, such services include, *inter*

---

**15.** In *Luciano*, the Second Circuit recently held that "[t]he 'lodestar' figure should be 'in line with those [rates]' prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation[,]" *citing Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984), the prevailing community being the district in which the court sits, *citing Polk v. New York State Dep't of Correctional Servs.,* 722 F.2d 23, 25 (2d Cir.1983). *Luciano, supra,* 109 F.3d at 115. Luciano would have placed in question the validity of using the District of Columbia rate formula—advanced by Semmes Bowen—had the rates not been presented, as they alternatively were, consistent with local practice.

**16.** *See also In re General Motors Corporation Pick–Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 820–21 (3rd Cir.1995).

**17.** The Third Circuit formed a Task Force that suggested that "lodestar" was a less useful tool than the percentage recovery method. *See, Court Awarded Fees: A Report of the Third Circuit Task Force,* 108 F.R.D. 237 (1985).

*alia,* response to inquiries from Class members relating to their appropriate share of recovery, work in establishing the Task Force, obtaining tax rulings and other activities that counsel initially estimated would comprise some 20% of their aggregate effort (or some $700,000 based on time charges to the date of approval of the settlement), but which counsel have subsequently suggested would entail additional time, effort and cost (see, fn.14, *supra* ). It is important that such services be rendered and appropriate payment therefor now be fixed. Since such services are to be rendered *in futuro,* it is necessary that a sum be set aside to be "due when, and only if" such services are actually rendered, thereby to insure "that the fees earned are based on a realized benefit, not an illusory projection." *Milstein v. Werner,* 58 F.R.D. 544, 551 (S.D.N.Y.1973) (Pollack, D.J.). *See also, Pollard v. United States,* 69 F.R.D. 646, 650–51 (M.D.Ala.1976).

Applying these criteria, it is recommended that plaintiffs' counsel receive an aggregate fee award of $19,154,144.62 (or 5.5 times the lodestar of $3,482,571.75), payable upon approval or modification by the District Court, plus *$1,000,000* to be held aside in the escrow account for payment (without interest) for said future services over the five years following approval of the settlement, such $1,000,000 to be payable upon bi-annual application to and approval by the Court in equal payments, unless the Court shall direct otherwise upon good cause shown.

Applying the criteria set forth above, the foregoing award, is fair and reasonable whether tested under lodestar or the percentage of recovery method. Preliminarily, however, several observations are necessary.

This case involved extraordinary skill and effort on the part of plaintiffs' counsel, particularly in view of the relentless effort, vigor and skill employed by Texaco's experienced and able counsel in pursuing a defensive strategy that maximized burden and left no litigation tactic unexplored. The risk of litigation was substantial, to say the least. Cases such as this have rarely produced significant recoveries and are fraught with problems of proof, being largely based on statistical data.[18] And, the result achieved was one that captured national attention and focused upon the importance of private attorneys general in enforcement of the proscriptions against racial discrimination in the workplace—a class action concern that has not received the same focus as have, for example, securities and products liability class actions, though it implicates concerns of considerable public importance. Further, this settlement also produced a result—the Task Force, monitoring and a five-year program to achieve equality of treatment—that could not otherwise have been accomplished. *Cf, Women's Committee for Equal Employment Opportunity v. National Broadcasting Co.* 76 F.R.D. 173, 180 (S.D.N.Y.1977). As Judge Lloyd MacMahon aptly noted in *Women's Committee:*

> Finally, as the Supreme Court has recognized, Congress has determined that enforcement of the Civil Rights Act is to a great extent entrusted to 'private attorneys general,' and plaintiffs should be encouraged to bring private actions to further the policies of the Act. *See, e.g., Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402 [88 S.Ct. 964, 966, 19 L.Ed.2d 1263]. . . .

*Id.* at 181. The point applies with equal force to counsel, as it does to the individual plaintiffs. After all, it is the skill, ingenuity, effort and risk of counsel that, in the final analysis, produces the result.

The starting point, in this Circuit at least, for measurement of a proper counsel fee award is lodestar. *See, e.g., Luciano v. The Olsten Corporation, supra.* The Courts have utilized lodestar formulas that range from less than two times the reasonable time charges to, approximately, a five-times factor. *E.g., In re Alcoholic Beverages Litigation,* 1983 WL 1808 (E.D.N.Y. April 8, 1983) (1.5 *multiplier used* ) (Sifton, D.J.) (; *In re*

---

**18.** It is true, of course, that the Lundwall tapes provided a fortuitous and significant advantage to plaintiffs and their counsel. However, such chance events can just as easily cripple a case as aid it. The fortuitous nature of the event should not, in my view, detract from the claim of counsel here in light of the totality of their skilled performance, dedication to the interests of their clients and the circumstances recounted above.

*Baldwin–United Corporation Litigation,* 1986 WL 12195 (S.D.N.Y. June 27, 1986) *(lodestar plus 2.0* multiplier used) (Brieant, D.J.); *Weseley v. Spear, Leeds & Kellogg, supra,* 711 F.Supp. at 716–20 (multiplier of *2.0 plus upward adjustment of .3 for efficiency* ) (Nickerson, D.J.) [19]; *Pepsico Sec. Litig.,* 1985 WL 44682 (S.D.N.Y. April 26, 1985) (multiplier of *3.3% stated to also represent 20% of settlement* ) (Sofaer, D.J.); *Rabin v. Concord Assets Group, Inc.,* 1991 WL 275757 (S.D.N.Y. Dec.19, 1991) *(4.4 multiplier* used) (Sand, D.J.); *see also, In re Beverly Hills Fire Litigation,* 639 F.Supp. 915 (E.D.Ky. 1986) *(5 times* multiplier); *In re Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.,* 778 F.2d 890 (1st Cir.1985) *(6 times* multiplier). See also, *In re RJR Nabisco, Inc. Securities Litigation,* supra).[20]

As the above cases make clear, the lodestar approach simply involves taking a base figure (predicated upon hours productively worked on the matter, times the value of such charges, times the multiplier) that then is adjusted upwards or downwards depending on factors ranging from the size of the common fund, to the efficiencies of counsel and complexity of the litigation, to, and, of particular pertinence, the risk of recovery. *In re Baldwin–United Corporation Litigation, supra,* 1986 WL 12195, p. 2; *See, Pennsylvania v. Del. Valley Citizens' Council,* 483 U.S. 711, 717, 726–27, 107 S.Ct. 3078, 3082, 3087–88, 97 L.Ed.2d 585 (1987) (White with Renquist, C.J., and Powell and Scalia concurring); *In re Alcoholic Beverages Litigation, supra,* 1983 WL 1808.[21]

In this instance, the risks of litigation were substantial in view of the nature of the dispute (significant recoveries in race discrimination cases such as this have been relatively isolated). The litigation itself was hard fought, with skilled counsel for Texaco waging a relentless defense on all fronts prior to the advent of the Lundwall tapes. The amount of time required to be expended was substantial. The discovery proceedings were extensive and time consuming. There is no evidence that counsel procrastinated or overworked the case or performed their task in other than an able and professional manner. And the ingenuity of counsel (and their respective clients) in framing an imaginative settlement, that may well have important ameliorative impact not only at Texaco but in the corporate context as a whole, likewise merit consideration.

Under such circumstances, a 5.5 times lodestar based on the $3,482,571.75 time charges appears reasonable. That, in turn, would generate a fee award of $19,154,144.62. That award, under the percentage of recovery method, would produce a recovery of approximately 16.66% of the $115 million common fund.

Measured or compared against the percentage formula, the Courts in this Circuit have frequently concluded that 15% to 30% of the aggregate recovery is reasonable. See cases collected in *In re Union Carbide, supra,* 724 F.Supp. 160; *Weseley v. Spear, Leeds & Kellogg, supra,* 711 F.Supp. at 718. *See also Eltman v. Grandma Lee's Inc.,* 1986 WL 53400, at *9 (E.D.N.Y. May 28, 1986) *(slightly less than 30%* ) (Glasser, D.J.); *In re New York City Mun. Sec. Litig.,* 1984 WL 2411, at *2 (S.D.N.Y. March 28, 1984) *(almost 33%* ) (Owen, D.J.); *In re Franklin Nat'l Bank Sec. Litig.* [1980 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,571 at 97,988 (E.D.N.Y. June 24, 1980) *(34%* ); *In re Emerson Shareholder Litigation,* 1992 U.S. Dist. LEXIS 20934 (E.D.N.Y. April 16, 1992) *(37.08%)* (Weinstein, C.J.); *Greene v. Emersons Ltd.,* 1987 WL.11558 (S.D.N.Y. May 20, 1987) *(46.2%* ) (Haight, D.J.). The approxi-

---

**19.** *Weseley* collects a series of cases, many unpublished, on both the percentage and multiplier approaches. *Id.*

**20.** Plaintiffs' counsel, in a supplemental submission, dated July 15, 1997, cite RJR as authority for 6 times lodestar multiplier. The case does not quite stand for the cited proposition. In *RJR* Judge Mukasey used the percentage of recovery method in awarding counsel fees in a securities class action. An objector complained that the fees proposed would amount to an award of 6 times the lodestar and was excessive. Judge Mukasey disagreed and sustained the award.

**21.** *Cf., Maywalt v. Parker & Parsley Petroleum,* 864 F.Supp. 1422, 1435–37 (S.D.N.Y.1994) (Sweet, D.J.), concluding that absent "exceptional circumstances" and the need for "judicial encouragement" of the type of action at issue, lodestar provides a sufficient reasonable fee.

mately 16.66 percentage of the common fund that here is recommended is certainly not out of line with the foregoing.

Still another check and balance against windfall awards exists—the so-called sliding scale approach. *See e.g., International Travel Arrangers, Inc. v. Western Airlines, Inc., supra,* 623 F.2d 1255; *Dunn v. H.K. Porter Company, Inc., supra,* 602 F.2d 1105; *see also, Berchin v. General Dynamics, supra,* 1996 WL 465752; *In re First Fidelity Bancorporation Sec. Litig. supra,* 750 F.Supp. 160; *Milstein v. Werner, supra,* 58 F.R.D. at 551–52; *Third Circuit Task Force Report, supra,* at 256. Applying a sliding scale of 25% on the first $25,000,000 recovered, 20% on the next $25,000,000, 15% on the next $30,000,000 and 9.73% on the remainder—a sliding scale formula not dissimilar from that recently proposed in *Berchin*—produces essentially the same lodestar-multiplier result here proposed. Hence, applying lodestar and then comparing it against the percentage method and the sliding scale approach all permit of an award, as here, of $19,154,-144.62.

■ Finally, plaintiffs' counsel seek fees for the work to be performed and which, under the settlement agreement, is manifestly essential. That work over the five-year term of monitoring provided under settlement agreement, includes, *inter alia,* the selection and constitution of the Task Force, obtaining tax rulings, computing allocations, communicating with Class members with respect to the criteria to be used in calculating their individual distributions and resolving their inquiries, resolving outstanding disputes with Texaco's Human Resources Department, and reviewing and evaluating the Task Force annual reports and the information that the Task Force shall submit to the Court, Texaco's Chairman and others concerning the impact of the settlement. These are time-consuming tasks requiring skill and judgment. Thus, it has taken months of sometimes contentious confrontation for counsel and the parties to finally constitute the Task Force—and, even then, the Court's intervention was essential. It cannot be gainsaid that considerable additional services will be indispensable. Whether such services

will, in fact, entail time requirements equivalent to 20% or more of that already expended is, at best, speculative (see fn. 14, *supra*).

In *Milstein v. Werner, supra,* Judge Milton Pollack provided guidance for dealing with situations such as this, directing that the award for future benefit be deferred and geared to a "realized benefit." 58 F.R.D. at 551. *See Pollard v. United States, supra,* 69 F.R.D. at 650.

This record makes clear that, while plaintiffs counsel are precluded from including for purposes of fee computation the claimed benefits to the Class over and above the common fund of $115 million, there was in fact a significant and economically quantifiable benefit over and above the $115 million. Plaintiffs' expert, Dr. Charles Mann, in an affidavit sworn to March 11, 1997, estimated at $35 million the value of the cost of initiating and maintaining the Task Force (in connection with which plaintiffs' counsel have performed post-settlement services of value and consequence, and plainly will be doing so again in the future), plus some $22 million value for the wage increases over the five year settlement period (and, as noted above, plaintiffs' counsel have been and will be called upon to respond to Class inquiries with respect thereto). Certainly these prospective services will produce value that merits consideration, albeit not as part of the common fund as against which recovery is to be measured.

Plaintiffs' counsel initially estimated that the value of such future services would amount to 20% of the value on a current rate basis of the services rendered pre-settlement. Later, as experience in the first several months following approval of the settlement showed that the initial estimate was understated, plaintiffs' counsel revised upwards their initial estimate (see fn. 14, *supra*). Plaintiffs' counsel did not bifurcate the valuation of their services for fee award purposes, or, as here recommended, seek to obtain a distinct fee award for such services. Instead, plaintiffs' counsel sought a lump sum fee award of $28,750,000 or 25% of the $115 million common fund, *including* the prospective services. In this era of all too numerous examples of law firm instability or personnel changes, it would be unwise and

unfair to the Class to pay in advance for services to be rendered without some assurance that counsel are in fact available when needed and willing to render such services.

To insure that the benefit paid for is realized and that the payment therefor is made when realized, it is recommended that the prospective services aspect of fee payment be deferred and paid bi-annually in each of the five pertinent years upon application to and approval by the Court. While, for the reasons noted and discussed at length above, a lodestar multiplier of 5.5 times is reasonable as to the major aspects of the fee award, a multiplier seems inappropriate as to this aspect of the services. To illustrate, as to future services there is little recovery risk at this juncture. However, the services to be performed will, as recent events have demonstrated, require considerable time, effort and skill, quite likely more than had initially been contemplated. Accordingly, it is recommended that a further fee award be made for future services in the aggregate amount of $1,000,000, payable in bi-annual installments of $100,000, or such other sum as the Court may direct, following bi-annual application to the Court.

## II

### THE INCENTIVE AWARD APPLICATIONS

Plaintiffs Roberts and Chambers each seek incentive awards of $200,000 over and above their appropriate share of the ultimate recovery. The four additional plaintiffs named in the First Amended Complaint—plaintiffs Harris, Hester, Williams and Shinault—each seek $100,000. In each instance, it is, in sum, claimed that the applicant played an indispensable part in the prosecution of the litigation.

In this Circuit, the Courts have, with some frequency, held that a successful Class action plaintiff, may, in addition to his or her allocable share of the ultimate recovery, apply for

and, in the discretion of the Court, receive an additional award, termed an incentive award. The guiding standard in determining an incentive award is broadly stated as being the existence of special circumstances including the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and, of course, the ultimate recovery. *See, e.g., Yap v. Sumitomo Corp.,* 1991 WL 29112, 1991 U.S. Dist. LEXIS 2124 (S.D.N.Y. Feb. 21, 1991 (Sand, D.J.)); *Green v. Battery Park City Authority,* 44 Fair Empl. Prac. Cas. (BNA) 623 (S.D.N.Y.1987) (Cedarbaum, D.J.); *Block v. Revlon,* 37 Fair Empl. Cas. (BNA) 1327 (S.D.N.Y.1985) (Krane, D.J.); *Wire Service Guild v. Associated Press,* No. 78 4502, No. 79 0991, slip op. (S.D.N.Y. Sept. 23, 1983) (Motley, D.J.).[22]

Other jurisdictions have likewise granted incentive awards upon substantially the same grounds. *See, e.g., Gaskill v. Gordon,* 1995 WL 746091 (N.D.Ill.Dec.14, 1995), *motion to reconsider granted on other grounds,* 942 F.Supp. 382 (N.D.Ill.1996); *In re Catfish Antitrust Litigation,* 939 F.Supp. 493 (N.D.Miss.1996); *Van Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294 (N.D.Cal. 1995); *In re Revco Securities Litigation,* 1993 WL 497208 (N.D.Ohio Sept.14, 1993); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240 (S.D.Ohio 1991); *In re Dun & Bradstreet Credit Serv. Customer Litigation,* 130 F.R.D. 366 (S.D.Ohio, 1990).

The argument most frequently advanced against the grant of incentive awards is that:

A class representative is a fiduciary to the class. If class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be

---

**22.** The foregoing are Employment Discrimination cases. In this Circuit, the bulk of the reported decisions granting incentive awards arise out of securities litigation. *e.g., In re Sapiens Securities Litigation,* 1996 WL 689360 (S.D.N.Y. Nov.27, 1996); *In re Presidential Life Securities,*

857 F.Supp. 331 (S.D.N.Y.1994); *Kazanas v. Millicom Inc.,* 1992 WL 237358 (S.D.N.Y. Sept.17, 1992); *Diamond v. Fogelman,* 1992 WL 203779 (E.D.N.Y. Aug.3, 1992); *Golden v. Shulman* 1988 WL 144718 (E.D.N.Y. Sept.30, 1988).

tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.

*Weseley v. Spear, Leeds & Kellogg,* 711 F.Supp. 713, 720 (E.D.N.Y.1989), citing *Women's Committee for Equal Employment Opportunity v. National Broadcasting Co.,* 76 F.R.D. 173, 180 (S.D.N.Y.1977). *See also In re Continental Illinois Securities Litigation,* 962 F.2d 566 (7th Cir.1991); *In re Carbon Dioxide Antitrust Litigation* 1996 WL 523534 (M.D.Fla. July 15, 1996); *In re Laidlaw Securities Litigation,* 1992 WL 236899 (E.D.Pa. Sept.15, 1992); *In re Gould Securities Litigation,* 727 F.Supp. 1201 (N.D.Ill.1989).

■ Mindful of the possibility that, for a variety of reasons, suboptimal settlements may be proposed, the Courts scrutinize settlements with precisely that potential in mind. And, as here, when it comes to incentive awards, the inquiry is whether there are present special circumstances warranting grant of an award. *Women's Committee, id.* at 181–182. However, there is a fundamental distinction between litigation based on claims of racial, gender or other discrimination, and securities-based litigation (like *Weseley* ) or antitrust suits—the primary reported instances in which incentive awards have been sought.[23] In securities cases, it is rare that the plaintiff—usually a shareholder who has little continuing contact with the defendant—is exposed to or can establish personal risk by reason of his or her having prosecuted the suit.[24] In discrimination-based litigation, the plaintiff is frequently a present or past employee whose present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, who therefore lends his or her name and

efforts to the prosecution of litigation at some personal peril. *See, Thornton v. East Texas Motor Freight* 497 F.2d 416, 420 (6th Cir.1974) ("We also think there is something to be said for rewarding those drivers who protest and help to bring rights to a group of employees who have been the victims of discrimination"); *Re v. Chase Manhattan Corporation, supra,* 20 Empl. Prac. Dec. (CCH) ¶ 30,057; *Women's Committee,* 76 F.R.D. at 182 ("... plaintiffs here ... undertook significant obligations, perhaps at some risk to job security and good will with co-workers, resulting in broad-ranging benefits to the class").[25]

The reported cases that permit separation of the incentive award from an award to plaintiff as a member of the class or on some individual claim generally range from individualized awards of $50,000 (e.g., *Van Vranken v. Atlantic Richfield Co., supra,* 901 F.Supp. 294; *Enterprise Energy Corp. v. Columbia Gas Transmission Corp., supra,* 137 F.R.D. 240; *In re Dun & Bradstreet Credit Serv. Customer Litigation, supra,* 130 F.R.D. 366); to $30,000 (*Yap v. Sumitomo Corp., supra,* 1991 WL 29112, 1991 U.S. Dist. LEXIS 2124); to $4,000 (*Green v. Battery Park City Authority, supra,* 44 Fair Emp. Prac. Cas. (BNA) 623); to lesser sums. One exception to that range of awards was *In re Revco Securities Litigation,* 1992 WL 118800 (N.D.Ohio 1992) and 1993 WL 497208 (N.D.Ohio Sept.14, 1993), a securities class action, in which $200,000 was awarded to a corporate plaintiff (that had sustained a $514,000 investment loss and whose employees had expended many hours in aiding in the prosecution of the litigation) who later received an additional $50,000.[26] No mean-

---

**23.** See fn. 15, *supra.*

**24.** In antitrust cases, the plaintiff is frequently a competitor or customer who claims injury on a distinctly different basis from that at issue here.

**25.** Additionally, it may be argued that incentive awards in this context serve the salutary purpose of encouraging "private attorney[s] general" to further policies that seek to bar unlawful discriminatory practices and policies. *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968).

**26.** Plaintiffs' counsel cited to cases reported in the press as having resulted in significant reported *aggregate* awards that appeared to embrace, without distinction, both the class award and the incentive award. Upon review of court papers from those cases, subsequently submitted by counsel, it is apparent that the cases do not involve court-ordered awards of incentive fees on the scale suggested by counsel. See *Shores v. Publix Super Markets, Inc.,* Civ. No. 95–1162–Civ.–T–25E (M.D.Fla.) (according to the consent decree that determined all settlement awards, $29,585 of awards specifically provided to Class Representatives were in consideration for full

ingful guidelines of broad applicability are discernible from the reported decisions as to the appropriate measure for an award, the focus being on special circumstances.

■ Special circumstances are amply evident here. The record reveals that most, if not all, of the plaintiffs were aware from the outset that Texaco had previously retaliated against employees charging discrimination. *See Malarkey v. Texaco Inc.*, 794 F.Supp. 1237 (S.D.N.Y.1992); *Malarkey v. Texaco Inc.*, 794 F.Supp. 1248, 1251 (S.D.N.Y.1992), *aff'd* 983 F.2d 1204 (2d Cir.1993). There is also evidence that an African–American attorney employed by Texaco, who had been trying to initiate a race discrimination class action against Texaco, was fired, assertedly because of such efforts, and that several plaintiffs knew of that event and that it "petrified most of the individuals who wanted to commence a class action and most of these people gave up for fear of losing their jobs." (Roberts April 24, 1997 Aff. at ¶ 11; see also, Chambers April 23, 1997 Aff. at ¶ 12). Indeed, several plaintiffs claim that, following commencement of the litigation, they were subjected to retaliatory action by Texaco supervisors and employees, ranging from hostility to threats to assignment changes (*See, e.g.,* Roberts April 24, 1997 Aff. at ¶ 20–22; Chambers April 23, 1997 Aff. at ¶ 22–25; Williams April 23, 1997 Aff. at ¶ 10–11).

The record also reflects that, to varying degrees, each of the plaintiff-applicants expended time and effort in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., knowledge of and the ability to analyze and explain Texaco's practices). And several of the plaintiffs suffered direct injury.

On this record, it cannot be doubted that these plaintiffs amply meet the basic qualifications for an incentive award. It also seems clear that plaintiffs, in varying measures, endured an undue and meaningful burden as a result of their willingness to come forward and lend themselves to the prosecution of litigation that achieved a significant benefit for the Class, thereby directly confronting an employer that was perceived as being willing to exact retribution.

### *Bari-Ellen Roberts.*

■ This record evidences that Ms. Roberts, one of the original plaintiffs, undoubtedly was a major force in the initiation and prosecution of the litigation. It appears that Ms. Roberts, who had been a Vice President and Team Leader in the Corporate Pensions Department at Chase Manhattan Bank before joining the Finance Department at Texaco's Harrison, New York headquarters, determined to press discrimination claims against Texaco when her requests for consideration of equal opportunity programs were rejected in racially disparaging terms [27] and when she was denied advancement that seemed merited.

In a particularized affidavit, sworn to April 24, 1997, and in response to questioning at the conference with the Special Master, Ms. Roberts made a persuasive case that she had been specially burdened by her role as a plaintiff, in terms of personal risk and her active participation in the prosecution of the suit. She detailed historical instances where sex discrimination complaints had been met with retaliation by Texaco and the chilling effect that that had on her and those who she

releases over and above gender discrimination claims; $20,500 was provided for risks and potential liability; $17,625 was provided for time and effort expended; and $3000 was to be paid to any class member who was deposed); and (*Stender v. Lucky Stores, Inc.*, No. 88 Civ. 01467 N.D. Cal.) (consent decree provided for awards of $100,000 to $275,000 for the named plaintiffs, whose share of class damages was, accordingly, curtailed; no indication being provided of what portion, if any, of the settlement amounts were intended to be "incentive" payments); *Haynes v. Shoney's, Inc.*, No. PCA 89–30093–RV, 1993 WL 19915 (N.D.Fla.) (consent decree provided for $100,000 settlement payments to named plain-

tiffs, and awards for other "special claimants" ranging from $20,000 to $40,000; all amounts to be offset against any awards received through normal claims processes).

27. Disturbingly, Ms. Roberts noted that when she and plaintiff Chambers presented their research respecting equal employment programs to Texaco's Vice President of Human Resources (significantly, one of the participants in the Lundwall Tapes), the suggestions were rejected with racially disparaging remarks—"before you know it, we will have Black Panthers in the Texaco parking lot". Roberts April 24, 1997 Aff. at ¶ 9.

sought to have join her in these proceedings, particularly in terms of concerns respecting continued employment. She maintains that she was threatened with physical violence by a superior following the filing of the suit, and that senior management, with whom she worked at Texaco's Harrison headquarters, were hostile towards her and plaintiff Chambers. The tension continued even after conclusion of the settlement, at which point she and Chambers were assertedly told by Texaco's EEO officer not to "show our faces at Texaco for a while."

Ms. Roberts' active participation in the prosecution of the litigation ranged from regular conference calls with counsel and the other plaintiffs, to assisting counsel and participating in the discovery phase, to conferring with class members and witnesses, to maintaining an active role in the mediation process. In many instances, Ms. Roberts was required to take vacation days (rather than to take time off) to participate in the discovery and mediation phases.

In terms of the ultimate class action recovery, it is estimated that Ms. Roberts will be at the low end of the range (most class members will, it is estimated, receive between $60,000 and $80,000 each from the cash portion of the settlement). She will also not receive the 11.34% salary increase afforded current employees under the settlement since, subsequent to the settlement, she resigned from Texaco under circumstances that merit comment.

Following conclusion of the settlement, Ms. Roberts was advised by Texaco's EEO Officer that she should absent herself from Texaco for a while because the Company "needed a cooling off-period." (Roberts Aff. ¶ 40). Accordingly, her counsel arranged for "individual relief" under which she would be granted a two-year paid leave of absence to pursue an M.B.A. degree at Texaco's expense. Thereafter, she was afforded an opportunity to write a book.[28] Texaco objected

to her doing so while on the paid leave. Her "Hobson's choices" thus were to take the paid leave of absence and not write the book, to return to work (despite the contrary advice of Texaco's EEO Officer) and write the book while working at Texaco, or to leave Texaco's employ and write the book, seeking to obtain whatever severance, if any, was available under all of the circumstances. Ms. Roberts opted to resign rather than forego the opportunity to write the book, which she viewed as her obligation to "inspire others to have the courage and fortitude to stand up for what is right." (*Id* at ¶ 40–42).

As part of her separation agreement with Texaco, Ms. Roberts agreed, inter alia, to deliver a General Release, not to serve as a Class Representative in this action, to submit to Texaco a pre-publication copy of the galley proofs of any book she might write concerning this action or her employment by Texaco and to delay publication until November 15, 1998. In turn, Ms. Roberts received a severance payment of $125,000, which, according to her counsel, was "typical of the severance accorded employees of her pay grade and status." Counsel has estimated that, had Ms. Roberts continued in Texaco's employ under the agreement which allowed her to attend business school, her salary would have been $95,284 for 1997 and $100,048, including the 11.34% salary increase produced by the settlement and the standard 5% annual pay increase. Hence, even if one were to disregard counsels' claim that the severance paid was no more than the norm (in which event Ms. Roberts' loss could be said to approach $200,000), Ms. Roberts still sustained a net loss of some $70,000 ($125,000 in severance versus slightly more than $195,000 in lost leave of absence pay).

Based on the totality of the circumstances, it is recommended that Ms. Roberts receive an incentive award of $85,000. While that award is an upward departure from the cited precedents, it seems amply warranted. It

---

**28.** A copy of the publishing agreement and of the January 22, 1997 agreement between Texaco and Ms. Roberts respecting the terms of her separation from Texaco's employ were furnished to the Special Master, at his request, following the April 30 conference. The publishing agreement reflects that the bulk of the $50,000 initial payment

due prior to editorial acceptance of the outline and, later, the manuscript is to go those assisting Ms. Roberts in authoring the book. There is no assurance that the remaining initial payments will be forthcoming; they are conditioned on editorial acceptance.

seems clear that Ms. Roberts, together with plaintiff Chambers, was a driving force in the initiation of this litigation and in its prosecution to a successful conclusion, a result that mightily benefited the Class. It, likewise, seems clear that she not only faced personal risk, she was subjected to, at least, verbal abuse. Finally, in undertaking and actively pursuing her role as plaintiff, Ms. Roberts suffered loss not only in terms of vacation and other time taken to pursue the litigation, but also in terms of out-of-pocket loss resulting from the circumstances attendant to her separation from Texaco.

### Sil Chambers

■ Mr. Chambers worked with Ms. Roberts in the Texaco Finance Department at its Harrison headquarters. Mr. Chambers holds Bachelor of Arts and M.B.A. degrees from N.Y.U. Prior to joining Texaco, he worked for the Federal Reserve Bank of New York and at Prudential–Bache Securities. He received several awards from Texaco. Together with Ms. Roberts, he decided to try to reform perceived discriminatory hiring and promotion policy. The results of that effort have been noted above. Like Ms. Roberts, Mr. Chambers knew of the firing of the African–American attorney who had endeavored to initiate proceedings against Texaco based on its racially discriminatory practices, as well as the retaliatory actions that had followed the filing of gender-based discrimination claims. Despite the chilling effect that Mr. Chambers says these events created, he joined Ms. Roberts in identifying class counsel and in actively pursuing its successful prosecution at some cost, including the loss of vacation time.

Mr. Chambers helped counsel draft the charge relating to Texaco's Performance Management Process evaluation system, which system later was invalidated by the Equal Employment Commission as invalid and discriminatory against women and minorities. During the course of his internal challenge to that policy, Texaco's Treasurer assertedly pressed him to withdraw it in exchange for a salary increase. Mr. Chambers refused the offer. (See Chambers April 23 Aff. at ¶ 15–17). That episode, in turn,

caused Mr. Chambers to press for the initiation of this litigation.

In his April 23, 1997 affidavit and in testimony before the Special Master, Mr. Chambers recounted that, following the commencement of this action, he was subjected to attempts by superiors to embarrass him before senior officials of Texaco, was threatened and was denied advancement ratings. He asserts that his son was ostracized by his teacher, who criticized the child for his father's role in this litigation (Id at ¶ 25). Mr. Chambers presented a persuasive case of personal embarrassment and attempts at humiliation.

It is estimated that Mr. Chambers will be among those in the low range of the $60,000 to $80,000 in cash benefits to be derived from the settlement. Having been cautioned by Texaco's EEO officer to not "show your face at Texaco for a while" following the consummation of the settlement, Mr. Chambers was the recipient of individual relief, pursuant to which he was placed on a one-year "Executive on Loan" leave, receiving full pay from Texaco while working as Chief Financial Officer of his church. Mr. Chambers' current salary is $88,700.

What has been said above concerning Ms. Roberts' contribution to the successful prosecution of this litigation and the risks, burdens and humiliation sustained by reason thereof, applies with equal force to Mr. Chambers. It appears, however, his out-pocket loss may not have been as substantial as that of Ms. Roberts'. It is recommended that Mr. Chambers receive an incentive award of $50,-000.

### Plaintiffs Williams, Harris and Hester

■ The essential facts respecting each of these plaintiffs, as established (without contradiction) in their supporting papers and at the conference with the Special Master, are substantially similar. Each joined the litigation subsequent to its commencement by Plaintiffs Roberts and Chambers. Each did so following one or more incidents giving rise to the conviction that discriminatory practices had impeded advancement at Texaco. Each was aware, prior to joining the proceedings, that others had faced what ap-

peared to be retribution for similar actions, and, nonetheless, became a plaintiff out of a sense of conviction that it was the right thing to do. Each participated in one fashion or another in aiding in the prosecution of the litigation.[29] Each was required to devote time, generally vacation time, to that task. Following their joinder as plaintiffs, each was subject to hostility—manifested in lesser job evaluations and diminished compensation increases (Williams Aff at 10–11), less significant job assignments and ostracism (Harris Aff at ¶ 14), and to transfer to a more remote job location (Hester Aff. at ¶ 15–16). It seems clear, however, that plaintiffs Roberts and Chambers have borne, at least, the initial brunt of the proceedings and, without in any way diminishing the fortitude shown by these plaintiffs, they and their counsel correctly concluded that they should receive a lesser award than plaintiffs Roberts and Chambers (they seek $100,000 each, while plaintiffs Roberts and Chambers seek $200,000 each).

It is recommended that plaintiffs Williams, Harris and Hester each receive an incentive award of $25,000.

### Plaintiff Shinault

Much of what has been said above applies to Ms. Shinault, in terms of joining the litigation after its initial commencement by plaintiffs Roberts and Chambers, in terms of the burdens attendant to being a plaintiff (in submitting to deposition and feeling demeaned in the proceedings), and in providing (while using vacation time) valuable assistance to counsel in prosecuting the litigation. However, there is one critical element that separates Ms. Shinault from the other plaintiffs. She resigned from Texaco shortly before the commencement of this action by plaintiffs Roberts and Chambers. Hence, her submission lacks any significant showing of post-litigation burden or risk. It is estimated that Ms. Shinult will receive between $30,000 and $40,000 when the settlement funds are ultimately distributed.

29. The April 23, 1997 affidavit of Ms. Harris makes the disturbing allegation that the Reporter who took her deposition testimony supposedly omitted to transcribe portions of it for fear of

It is recommended that Ms. Shinault receive an incentive award of $2,500.

### Conclusion

In sum, it is recommended that:

1. Plaintiffs' counsel receive (a) for legal services rendered prior to the entry of judgment a fee award payable out of the escrow fund (and without interest) upon approval by the Court in the amount of $19,154,144.62 (or 5.5 times the lodestar of $3,482,571.75), plus (b) a further payment out of the escrow fund and covering services to be rendered in the aggregate amount of $1,000,000 payable (without interest) over a five-year period in bi-annual installments, or in such other sum as the Court may direct, upon bi-annual application to and approval by the Court;

2. Plaintiff Roberts receive, in addition to whatever sums she might receive as a member of the Class or otherwise, the sum of $85,000;

3. Plaintiff Chambers receive, in addition to whatever sums he might receive as a member of the Class or otherwise, the sum of $50,000;

4. Plaintiffs Williams, Harris and Hester receive, in addition to whatever sums they might receive as a member of the Class or otherwise, the sum of $25,000; and

5. Plaintiff Shinault receive, in addition to whatever sums she might receive as a member of the Class or otherwise, the sum of $2,500.

A copy of the documentary materials not previously filed with the Court but provided to the Special Master and cited above, will be filed, together with the transcript of the April 30, 1997 Conference and a signed original of this report, with the Clerk of the Court. A copy of this report is simultaneously being served upon counsel for the parties.

losing business and that she aided counsel in "bringing ethical charges." (Harris Aff. at ¶ 22). The outcome of such proceedings is not set forth.

Pursuant to FRCP Rule 53, the parties who appeared before the Special Master shall have ten (10) days, plus an additional three (3) days, pursuant to FRCP Rule 6(e), or a total of thirteen (13) working days (see FRCP Rule 6(a)) from the date hereof, to file written objections to this Report. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of The Honorable Charles L. Brieant, U.S.D.J., at the United States Courthouse, 300 Quarropas Street, White Plains, New York 10601.